Ronald D. DAWSON, Plaintiff,

v.

NEW YORK LIFE INSURANCE COM-
PANY and NYLIFE Securities
Inc., Defendants.

No. 94 C 1423.

United States District Court,
N.D. Illinois,
Eastern Division.

July 19, 1996.

Thomas P. Sullivan, Thomas Shane O'Neill, Jenner & Block, Chicago, IL, Sherwin H. Leff, Leff, Cohen & Rosenberg, Ltd., Chicago, IL, for plaintiff.

James Andrew Klenk, Dale M. Cohen, Sally L. Davis, Sonnenschein, Nath & Rosenthal, Chicago, IL, Edwin G. Schallert, Frances L. Kellner, Debevoise & Plimpton, New York City, for defendants.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

On February 8, 1993, a state court jury in Corpus Christi, Texas found that New York Life Insurance Company ("New York Life") and one of its agents breached their duty of good faith and fair dealing, breached their fiduciary duty, and committed false, misleading or deceptive acts in connection with certain transactions involving a policy-holder and his wife. The jury also found that New York Life committed fraud in connection with these transactions. The jury awarded $65,000 in pecuniary losses, $1 million for mental anguish, and $15 million against New York Life as punitive damages. This was the first punitive damages award against New York Life in its 150–year history. Shortly thereafter, senior New York Life officers spoke at an annual New York Life Managers' Meeting, implicating local management at the Corpus Christi Office in the wrongdoing that gave rise to the Corpus Christi jury award. New York Life also produced a 30–minute videotape on corporate responsibility that was issued to every New York Life office for use in training agents. The videotape included excerpts from remarks made at the 1993 Managers' Meeting and specifically included the remarks implicating local management at the Corpus Christi Office.

The plaintiff in the present action, Ronald Dawson, was the General Manager of New York Life's Corpus Christi General Office from August 1985 to September 1989. Dawson brings this action against defendants New York Life and NYLIFE Securities, Inc.

("NYLSEC")[1] for defamation, intentional interference with prospective economic advantage, and intentional infliction of emotional distress based principally on the remarks made at the Managers' Meeting, the training videotape, and other allegedly defamatory statements. Dawson also asserts a breach of contract claim, alleging that New York Life breached an oral agreement relating to Dawson's compensation. Defendants' motion for summary judgment as to all of Dawson's claims is presently before the Court.

## RELEVANT FACTS[2]

*Dawson's Employment and Compensation Agreements with New York Life*

Dawson was employed by New York Life for more than 18 years, beginning in June 1974 when he started as an agent. Pl.'s Add'l Facts ¶ 1. Throughout his career with New York Life, Dawson was promoted to positions of greater and greater responsibility based on his performance as an agent and manager. In 1981, after previously serving as an agent and Assistant Manager, he was promoted to General Manager. *Id.* ¶ 2. From August 1985 to approximately September 1, 1989, Dawson was employed as the General Manager of the company's Corpus Christi, Texas General Office. Dawson's transfer to Corpus Christi was initiated by three senior New York Life officers. New York Life chose Dawson to manage the Corpus Christi Office because the company wanted a strong recruiter of agents in that office and Dawson was so regarded. *Id.* When Dawson arrived in Corpus Christi, there were approximately 38 agents in the office; when he left Corpus Christi in 1989, there were 126 agents working out of that office. *Id.* ¶ 3. Dawson received numerous awards while General Manager of the Corpus Christi Office. His office was selected as a field project location in connection with the agency home office management school—which is considered an honor. *Id.* ¶ 4. In 1987, Dawson's immediate supervisor Ernestine Beauchamp, who was then Regional Vice President, referred to Dawson as "the number one general manager" in the Southwest region. *Id.* ¶ 6.

Effective September 1, 1989, Dawson was transferred to the Oak Brook, Illinois General Office where he worked as that office's General Manager. Defs.' Facts ¶ 5. Dawson continued to earn awards and honors while General Manager of the Oak Brook office.

---

1. For ease of exposition, unless the context requires otherwise, this opinion will refer to defendants New York Life and NYLIFE Securities Inc. collectively as either New York Life or defendants.

2. The following recitation of facts is drawn from the parties' respective statements of material facts filed pursuant to Local General Rule 12. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS LOCAL GENERAL RULE (hereinafter "Local Rule") 12(M)(3). The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." *Id.* Defendants' statement shall be cited herein as "Defs.' Facts ¶——" Local Rule 12(N)(3)(a) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Dawson's response shall be cited as "Pl.'s Resp. Facts ¶——" Local Rule 12(N)(3)(b) authorizes the nonmoving party to submit a statement of "additional facts that require the denial of summary judgment." Pursuant to Local Rule 12(M), the moving party may then submit a response to the nonmoving party's additional facts. Dawson's statement of additional facts shall be cited as "Pl.'s Add'l Facts ¶ ——" and New York Life's response shall be cited as "Defs.' Resp. Add'l Facts ¶——." All *properly supported* material facts set forth in either party's statement (i.e., Defs.' Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted by the responsive statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Moreover, the mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453. All uncontested statements of fact in either party's statement (i.e., Defs.' Facts or Pl.'s Add'l Facts) are also deemed as being without substantial controversy for purposes of Rule 56(d) and shall be deemed as established for purposes of trial.

He traveled nationwide speaking on behalf of the company at training seminars and regional management schools. In 1990, Dawson was selected to speak at the company's national Managers' Meeting—which is considered an honor. Pl.'s Add'l Facts ¶ 9. For the year 1992, Dawson earned two major production awards for his performance as Oak Brook General Manager, which he was scheduled to receive at the company's 1993 National Managers' Meeting. *Id.* ¶ 10. On February 14, 1993, the same day that company officers decided to fire him, Dawson was speaking at a Regional Managers' Meeting in Chicago. *Id.* ¶ 11.

Dawson's tenure at the Oak Brook office was not without blemish, however. In March of 1992, the Senior Vice President in charge of the Agency Department, Lyle Paul, criticized Dawson, and reduced his compensation by approximately $27,000, for his conduct in connection with a federal criminal investigation of one of Dawson's top-performing agents. Specifically, Dawson had attended a meeting at the U.S. Attorney's office in Chicago without informing either his superiors or New York Life's Office of the General Counsel. *See* Paul Aff. ¶ 8.

As a General Manager, Dawson had a written employment agreement with New York Life which provided that Dawson's employment could be terminated with or without cause upon written notice. Defs.' Facts ¶¶ 6, 7. Before March of each year that Dawson was General Manager of the Oak Brook Office, New York Life notified Dawson in writing of his base compensation for the period from March 1 through February 28 of the following year. Dawson understood the writing to be a binding commitment. *Id.* ¶ 107. New York Life always honored the written commitments specifying Dawson's base compensation, except for the one occasion in 1992 on which his salary was reduced. *Id.* ¶ 108. Dawson continued to work after receiving the written descriptions of his base compensation. *Id.* ¶ 109.

Dawson was terminated in February 1993.[3] Prior to his termination, Dawson had been a registered representative of NYLSEC; when New York Life terminated him, NYLSEC terminated Dawson's registration. On February 25, 1993, NYLSEC sent a Form U–5 ("Uniform Termination Notice For Securities Industry Registration") to the National Association of Securities Dealers ("NASD") concerning Dawson's termination. As is explained in greater detail below, New York Life subsequently amended Dawson's Form U–5 on three occasions.

After he was fired by New York Life, Dawson (or someone working on his behalf) discussed employment with more than 12 top-rated insurance companies. Pl.'s Add'l Facts ¶ 123. NASD member firms are required to access a prospective employee's NASD file before hiring. New York Life knew when it filed the Form U–5s relating to Dawson that other NASD members would access Dawson's U–5 information before hiring him. *Id.* ¶ 126. Two companies, Minnesota Mutual and John Hancock, made inquiries to New York Life about Dawson. *Id.* ¶ 124. Also, New York Life knew of a prospective business arrangement Dawson had with Pruco Securities in July 1994. *Id.* ¶ 125. Dawson has not been able to broker securities for Pruco. *Id.*

### THE HERNANDEZ EVIDENCE AND VERDICT

Dawson's termination stemmed from the evidence presented at the Corpus Christi trial that resulted in the multi-million dollar punitive damages award against New York Life. In March of 1989, Ramiro Hernandez collected $331,000 in settlement of a personal injury suit. Later that month, he and his wife Lamar gave Oscar Herrera, who was then a New York Life agent in the Corpus Christi Office, $100,000 to purchase a $100,000 life insurance policy and an annuity. Herrera altered Mrs. Hernandez' life insurance application by adding a zero to increase it to $1 million, using $27,910 to pay the first premium and investing the balance of $72,090 in an annuity. To obtain underwriting approval for the $1 million policy, Hernandez forged a note from Mr. and Mrs. Hernandez stating falsely that they had obtained a $2 million settlement. Herrera subsequently falsified paperwork and endorsements to

---

**3.** The circumstances surrounding Dawson's termination are discussed *infra*.

withdraw $27,910 from the Hernandez annuity to pay the second premium on the $1 million policy, and to withdraw additional funds from the annuity. In October 1990, Ramiro Hernandez died and Mrs. Hernandez asked Herrera for a withdrawal from her annuity to pay for her husband's funeral and for living expenses. Rather than tell her that the annuity had been depleted, Herrera forged paperwork to withdraw money from another customer's annuity. In March 1991, Mrs. Hernandez discovered that she had a $1 million insurance policy rather than a $100,000 policy when she received a premium notice for the larger policy. Shortly thereafter, Mrs. Hernandez brought suit against Herrera and New York Life in Texas state court, resulting, on February 8, 1993, in a judgment of $65,000 in pecuniary damages, $1 million for emotional distress, and $15 million in punitive damages against New York Life. The jury found that New York Life committed "false, misleading or deceptive acts or practices in the business of insurance" and that New York Life had acted knowingly and had committed its misconduct "with heedless and reckless disregard of the rights of others." The jury was instructed that "New York Life" referred to "all" of New York Life's agents and employees "except Oscar Herrera." As to its finding of reckless disregard, the jury was also instructed that it could "consider only the conduct, if any, that [it had] found that is attributable to persons acting in a managerial or supervisory capacity."

Of relevance to Dawson's present defamation action against New York Life, is the testimony presented at the *Hernandez* trial concerning the Corpus Christi Office management's awareness, if not authorization of, and participation in, misconduct by agents and employees of that office. Indeed, there was substantial evidence of such misconduct and of management's awareness, authorization, and participation in it. The evidence of misconduct in the *Hernandez* testimony centered around agents' unauthorized conver-

sion of insurance policies (usually from term insurance to permanent insurance), forgery of policyholders' signatures, and unauthorized commission switching.

A. *Forgery and unauthorized conversions*

During his testimony in the *Hernandez* trial, Oscar Herrera testified that agents at the Corpus Christi Office forged policy holders' signatures, a practice known as "windowing."[4] With respect to management's knowledge of this conduct, Herrera testified as follows:

Q. And isn't it true sir, that these practices of windowing signature [sic] was done with the knowledge of management?

A. Correct.

Q. And specifically, it was done with the knowledge of Dale Gillum?

A. Correct.

Q. He was your supervisor.

A. Correct.

. . . . .

Q. And isn't it true sir, that this practice of windowing signatures or forging signatures occurred in large measure when people, when agents were converting ... term policies to whole life policies?

A. Correct....

. . . . .

Q. And isn't it true sir, that Dale Gillum was aware you were doing it?

A. Correct.

Record from Hernandez Case (hereinafter "Record") at 2622–23.

Herrera specifically testified that in June of 1989, he had forged the signature of a term policyholder (Richard Cruz) on a conversion application, and that Dale Gillum knew that he had forged Cruz's signature. *Id.* at 2630. Herrera also specifically testi-

---

4. One former New York Life agent explained the term as follows:

What I understand windowing signatures to be was you take the original application that you have a copy of in your client's file, you put it up against the window ... and take a blank application, put the signature area over the original signature of the client and trace over it.

Record from Hernandez Case at 1960 (Correa Testimony).

fied that Dale Gillum was aware that in 1987 Herrera had forged his own uncle's signature on a life insurance application and took money that his uncle had given him for the purchase of an annuity and used that money to pay the premium for the insurance policy.[5] *Id.* at 2625–28. In addition to these two instances of forgery, Herrera also testified as to a third in which he converted a life insurance policy through a forged application in June of 1990, again with the knowledge of Gillum. *Id.* at 2637. Herrera stated that both Gillum and Dawson would have benefitted from his conversions of the policies. *Id.* at 2629, 2631. Indeed, the evidence indicated that the majority of Herrera's forged conversions took place toward the end of June or December, which were significant months because they closed out periods for which compensation for managers was calculated. *Id.* at 2623–24.

Herrera testified that he had seen others windowing signatures and that Dale Gillum was aware of the practice but looked the other way. *Id.* at 2622–23. In regard to one instance in which Herrera forged a permanent life insurance policyholder's signature on a whole life conversion application, Herrera testified that Gillum participated in the misconduct by giving him the money to pay the first month's premium on the fraudulently procured whole life policy, *id.* at 2633–36; and, with respect to his conduct in the *Hernandez* case, Herrera testified that Gillum conspired with him, and encouraged him, to defraud the Hernandezes by altering their policy application.[6] *Id.* at 2668, 2672, 2708–09.

It is undisputed in the present action that "Oscar Herrera did not directly testify that Dawson knew of or participated in the Hernandez fraud, the Cruz forgery, windowing or any other fraud or forgery Herrera committed." Defs.' Resp. Add'l Facts ¶ 56. Additionally, Herrera expressly testified that Richard Miller, the Corpus Christi Office manager, did not know that Herrera had altered the Hernandez application from a $100,000 policy application to a $1 million application until two to three days or a week after the application was submitted. *Id.* at 2709–10.

Sonny Correa, a former agent from the Corpus Christi Office gave the following testimony regarding forgery of policyholders' signatures:

Q. Now, the management in that office between 1986 and 1988 were encouraging churning [7]; is that correct?

A. That is correct, yes, sir.

Q. And they were encouraging churning to the point where they were teaching agents such as you to forge policies without the—in other words, they wanted agents to churn and window and convert policies without the knowledge of the policyholder?

. . . . .

A. My personal experience was yes, that's what was going on.

---

**5.** Herrera testified that Gillum allowed him to forge this signature so that Herrera could save his job (apparently by meeting certain sales or commissions quotas). Record at 2629.

In a related vein, there was evidence at trial that, while Dawson was General Manager of the Corpus Christi General Office, he sought extensions of Herrera's agency contract when Herrera faced termination because of low productivity. Defs.' Facts ¶ 33. In December 1987, after already receiving two extensions for Herrera, Dawson wrote a letter to then Regional Vice President Ernestine Beauchamp, again requesting an extension, in which he wrote, "[w]e are now in a position to pull 'the rabbit out of the hat', and assuming our underwriting is successful, we will produce, in December, approximately $10,000 worth of First Year Commission on nine outstanding cases." Defs.' Record at R257. Herrera testified that the "rabbit out of the hat" that

Dawson was referring to was the policy application for his uncle which Herrera forged. Record at 2627–28. During his closing argument in the *Hernandez* case, the Hernandezes' attorney argued that Dawson's letter constituted circumstantial evidence that Dawson was "in on" the forgery. *Id.* at 4135.

**6.** Herrera explained that he owed Gillum over $5,000, Record at 2647, and that Gillum wanted Herrera to get a commission out of a million dollar policy sale so that Herrera could repay the debt he owed to Gillum. *Id.* at 2668, 2672, 2708–09.

**7.** [This Court's footnote.] Correa testified earlier that he was using the term "churning" to refer to converting policies so that more commissions could be generated. Record at 1977.

*Id.* at 1978. New York Life's counsel objected to this testimony on the ground, among other things, that the question failed to specify who was being referred to. The objection was overruled after the examining counsel explained that he was referring to "those managers," apparently a reference to "the management in that office between 1986 and 1988." *Id.* at 1978. Correa previously testified that Dawson was general manager. *Id.* at 1977. Correa testified that he had been asked to forge policies but that he refused. *Id.* The following colloquy ensued:

Q. When you said no to these things and told Mario [Olivarez] no, I'm not going to forge, you were—did you feel you were being branded kind of a trouble maker?

A. Yeah. That's right.

Q. Kind of like not a game man?

A. I would get called into Mr. Dawson's office and he would talk to me and try to set me straight.

*Id.* at 1979. However, when asked if he was ever asked to convert policies by Ron Dawson, Correa answered, "Not directly, no sir. But through Mario Olivarez my manager." *Id.* at 1966. Correa testified, "Mario said Dawson asked him to talk to me about converting policies." *Id.* at 1988.

Correa specifically identified two instances in which Olivarez asked him to convert policies by forging the policy holders' signatures—one policy holder was his father, the other was his uncle. *Id.* at 1988. With respect to the forgery of his father's signature Correa stated that Olivarez told him that "in January we'll just turn around and say that he looked over the policy and decided he didn't want it and convert it back to what he had originally."[8] *Id.* at 1970–71. When asked if he had specific experience of a manager telling him to forge policies, Correa responded, "Yes, sir, I sure do," and then he

referenced only these two instances involving Olivarez. *Id.* at 1978.

Correa testified that he had personally observed two agents in the office windowing signatures. Correa noted that the conduct was "obvious" to him and that other agents and management would have been able to observe the conduct as well. *Id.* at 1960–61. During cross-examination Correa acknowledged that he had only seen Herrera window a signature once and that he had only seen one other agent window a signature once. Pl.'s Supplemental Excerpts at H50.

Another former agent, Roland Garza, also testified that he was aware that windowing of signatures took place in the office, and that he was aware that many agents in the office engaged in the practice.[9] Record at 660. Garza also testified that conversion of policies was encouraged by management because more commissions would be generated by converting a policy from term to whole life. *Id.* at 661. (The question directed to Garza concerning management's encouragement of converting policies did not distinguish between legitimate, authorized conversions and unauthorized conversions.) Garza testified that, in his opinion, management's concern with "their pocket books" resulted in agents engaging in misconduct such as converting term policies to whole life policies without authorization. *Id.* at 694–95. Garza also testified that it was his opinion that "middle management, being Mario Olivarez, and upper management, being Dale Gillum and Ron Dawson, must have known about such practices." *Id.* at 695.

### B. *Commission switching*

The only testimony by Herrera that directly implicated Dawson in misconduct (albeit misconduct that is wholly internal to New York Life) was his testimony that Dawson directed that the commission earned on the Hernandez policy be split with two other agents who had no involvement in selling the

---

**8.** During closing argument in the *Hernandez* trial, the Hernandezes' attorney misstated Correa's testimony and attributed this statement to Dawson rather than Olivarez: "Remember the agent Sonny Corea [sic].... Remember Dawson told him, 'for your relatives go ahead and window, go ahead and forge and if we get caught we simply revert it back.'" Record at 4135.

**9.** In a related vein, Dawson's successor at the Corpus Christi office, Terry Richards, testified that it was his understanding that windowing occurred at the Corpus Christi office while Dawson was General Manager there. Pl.'s Add'l Facts ¶ 65.

policy. Record at 2669. This practice is referred to in the record as "commission switching" or "commission splitting." [10]

Correa also testified about the practice of commission switching in the Corpus Christi Office. Correa explained that New York Life maintained certain commission standards for its agents under which agents were required to average a certain amount of commissions over a three month period (referred to in the record as "quartering out"). And, Correa testified that when another agent was having difficulty quartering out, he (Correa) would be asked by his sales manager, Mario Olivarez, to shift some of his commissions to that agent in order to enable that agent to quarter out.[11] Id. at 1956–57. Indeed, Correa testified that the management in the Corpus Christi Office insisted on commission switching. Id. at 1975. When asked who benefitted from the practice of commission switching, Correa opined that "it wasn't helping anyone but management," id. at 1957; see also id. at 1975. This testimony was echoed by that of Roland Garza, who testified that management benefitted by the practice of commission switching because management bonuses were determined in part by the number of agents in the office that met New York Life's commission criteria. Id. at 645–46, 659.

Dale Gillum, the associate general manager at the Corpus Christi Office, testified that under Dawson's administration the practice of unauthorized commission switching was flagrant, and that the practice continued to a lesser degree under Dawson's successor Terry Richards. Id. at 2368–69. Gillum also testified that Dawson split Herrera's commission on the Hernandez policy between Herrera and two other agents who had no involvement in the sale of that policy. Id. at 2444–45. Gillum also testified that when Herrera complained to Dawson that another New York Life agent was going to try and sell the Hernandezes a policy, Dawson called that agent and essentially told him to back off because Herrera was there first. Id. at 2423. (Defendants rely on this testimony about Dawson as evidence indicating that Dawson was involved in the Hernandez fraud.)

Dawson did not testify at the Hernandez trial; however, he was deposed prior to the trial and the Hernandezes' attorney played a videotape of that deposition at trial. Dawson testified that he had not permitted commission switching except in rare situations, denied that he had ever been reprimanded for commission switching,[12] claimed that he had

---

**10.** Lyle Paul explains commission switching as follows:

> Commission switching involves the transfer of all or part of a commission from an agent (or agents) who earned the commission as part of the sale of an insurance policy to another agent (or agents). New York Life rules do not permit commissions to be switched for various reasons, including allowing an agent to qualify for Council. Agents attain various Council levels depending on their volume of commissions. Commission switching under such circumstances creates a false impression of an office's performance, rewards agents without justification and improperly results in higher compensation to local managers.

Paul Aff. ¶ 6.

**11.** Olivarez's testimony indicated that Dawson directed him to switch commissions, and that not only did Dawson encourage commission switching but that he participated in it as well. Record at 2160–62.

**12.** There is some implicit disagreement between the parties as to whether Dawson was "reprimanded" for unauthorized commission switching. The record in this case reflects that in March 1992, after a review of the Corpus Christi

general office, New York Life's General Auditor concluded that there had been "a practice of unauthorized commission switching by General Manager Ron Dawson from 8–85 to 8–89." Defs.' Facts ¶ 10. Lyle Paul, Senior Vice President in charge of the Agency Department, met with Dawson on March 30, 1992, and discussed the results of the Auditing Department review. Dawson did not deny his involvement in unauthorized commission switching during that meeting. When asked during his deposition for this action whether he considered Paul's remarks to be a reprimand for commission switching, Dawson said "No"; and, when asked if he was ever reprimanded, Dawson replied, "Not that I'm aware of, other than I did receive—he told me there would be a letter in my file that said 'Please follow the company rules' and so forth with regards to commission switching." Dawson Dep. at 252. Dawson also acknowledged that having such a letter in his file "would, I guess, be construed as a reprimand." Id. Lyle's letter includes the following remarks:

> The Auditing Department conducted a review of operations and discovered numerous instances where commission reassignments occurred. These reassignments resulted in the

told sales managers that they must stop the practice of commission switching and testified that the Office Manager had forged his signature to forms approving commission switches. Def.'s Facts ¶¶ 40, 41. Dawson also testified that he had no recollection of the $1 million Hernandez policy and denied any prior awareness that the commissions on the Hernandez policy had been switched.[13] Id. ¶ 42.

*New York Life's Familiarity with the Hernandez Case*

Alan Taxerman, the New York Life in-house attorney who was assigned responsibility for the *Hernandez* case, attended almost all of the trial and participated in strategic decisions throughout. Defs.' Facts ¶ 48. Prior to trial, Taxerman was involved in fact-gathering and responses to discovery. He attended several depositions and read the transcripts and viewed the videotapes of the others. Taxerman was in constant communication with Texas trial counsel assigned to the case, Corbet Bryant. Id. ¶ 49. Taxerman's familiarity with the trial was reinforced by notes that he took at trial, by his discussions with trial counsel, and by review of trial exhibits and certain daily transcripts. Id. ¶ 50.

Throughout the pretrial proceedings and the trial, Taxerman provided updates on the case to his superiors, including then General Counsel Alice Kane and other officers of New York Life, including Senior Vice President Lyle Paul and Executive Vice President Lee Gammill. The updates included reports of lax supervision and the atmosphere in the Corpus Christi Office, and evidence that the three local managers (Dawson, Gillum, and Miller) were involved in various wrongdoing.[14] Id. ¶ 51.

William Morrison, an Assistant Vice President in New York Life's Agency Department, was designated as one of New York Life's official representatives at the *Hernandez* trial. Morrison kept notes of the trial evidence and reported to Paul and Gammill about that evidence. Pl.'s Add'l Facts ¶ 47.

Immediately after the *Hernandez* verdict, several meetings were held at the New York Life home office in which evidence that led to the verdict was analyzed, as were the company's possible legal and business responses to the verdict. Alice Kane participated in discussions with Taxerman, Texas trial counsel (Corbet Bryant), and new counsel (John Koeltl, then a partner at the New York law firm of Debevois & Plimpton). Defs.' Facts ¶ 52. Part of the discussions focused on the theme of the *Hernandez* trial that local management knew of or participated in improper conduct such as commission switching, unauthorized conversions, forgery, providing loans to agents, and selling leads to agents. Id. ¶ 53. With the assistance of Taxerman and Koeltl, Kane prepared a presentation concerning the *Hernandez* case for the Board of Directors. Id. ¶ 54. Kane's presentation omitted discussion of evidence of any "misconduct" by the New York Life home office that might have contributed to the verdict, such as the home office's failure to take any

---

impression of improved performance records for you and your associates and resulted in additional compensation for you.

· · · · ·

Ron, we expect you to abide by the highest ethical standards without exception.
Defs.' Appendix at A129. The trial exhibits in the *Hernandez* litigation, included New York Life's internal audit report. Record at 235–40.

**13.** The New York Life in-house attorney assigned to the *Hernandez* case, Alan Taxerman, was advised of the content of Dawson's deposition by Texas trial counsel, Corbet Bryant. Taxerman also reviewed a transcript of the deposition as well as the videotape. Bryant and Taxerman both concluded that Dawson was not credible and should not be called as a witness. Taxerman Aff. ¶¶ 16–19. Taxerman states, "Dawson's testi-

mony on key points was directly opposed to sworn testimony of other witnesses and to documentary evidence and was simply unbelievable." Id. ¶ 17. In addition to finding Dawson's denial that he committed commission switching to be incredible, Taxerman also found Dawson's denial of any recollection of Herrera's sale of the $1 million Hernandez policy to be unbelievable, in part because of testimony that Dawson had advised another agent to not solicit the Hernandezes. Id. ¶ 18.

**14.** Although Dawson does not expressly dispute that Taxerman's updates included evidence that these managers were involved in wrongdoing, Dawson does dispute that Taxerman provided to his superiors any evidence that Dawson knew of, participated in, or condoned policyholder fraud or forgery. Pl.'s Resp. Facts ¶ 51.

disciplinary action toward Oscar Herrera despite being on notice of customer complaints, despite having knowledge of three documented instances of unauthorized conversions, and despite the fact that Terry Richards (Dawson's successor at the Corpus Christi Office) recommended he be fired based on allegations of forgery and policy switching in another case.[15] *See* Kane Dep. at 237–38.

*Dawson's Termination*

Lyle Paul had received reports on the *Hernandez* case from Taxerman, Texas trial counsel, and others. Within one week after the *Hernandez* verdict, Paul made the decision to terminate Dawson. The decision was made in consultation with Kane, Lee Gammill, and New York Life Chairman Harry Hohn. Defs.' Facts ¶¶ 55–57. Paul instructed John Zorio, Dawson's immediate supervisor, to deliver a letter of termination to Dawson. *Id.* ¶ 58. Zorio arranged for a meeting with Dawson on February 16, 1993 between 7:00 and 7:30 a.m., prior to normal office hours. Zorio and an assistant met briefly with Dawson in his office and delivered the termination letter. No one else was present except a security guard who sat outside Dawson's office. New York Life subsequently arranged for Dawson's personal belongings to be delivered to him. *Id.* ¶¶ 59–61. The same day, New York Life terminated the employment of Richard Miller, the

former Corpus Christi Office Manager. Associate General Manager Dale Gillum had resigned from the company in November 1992. *Id.* ¶ 62.

## *THE ALLEGEDLY DEFAMATORY STATEMENTS*

### I. The 1993 Managers' Meeting

#### A. *Alice Kane's Remarks*

New York Life's annual Managers' Meeting took place February 28 to March 4, 1993—approximately three weeks after the *Hernandez* jury returned its verdict. General managers of each of the company's general offices were invited, as were certain other local managers and some senior officers of the company. More than 700 New York Life managers, employees and their spouses from all over the United States attended the meeting, which was held in Hawaii. Pl.'s Add'l Facts ¶ 19. Senior New York Life officers believed that the *Hernandez* case implicated the interests of New York Life, its employees, agents, policyholders, customers, and the public. Among those interests were protecting New York Life policyholders and potential customers, and enforcing company rules. To further these interests, senior New York Life officers believed that it was important to report to the managers about lessons from the *Hernandez* case and about the role of

**15.** Dawson's principal theory of the present lawsuit is that defendants defamed him in an effort to divert attention from evidence of failings at the New York Life home office. Indeed, one of the plaintiff's themes in the *Hernandez* case was that New York Life home office personnel engaged in a corporate-wide scheme of greed, fraud and cover-up in their handling of the Hernandezes' insurance policy. Pl.'s Add'l Facts ¶ 76. One of New York Life's representatives at the trial, Richard Morrison, testified that New York Life had an underwriting policy, designed to prevent forgery, that any application signed with an "X" must be witnessed by two disinterested parties and include a statement as to why the witnesses were required. Record at 3607–08. Morrison further testified that, in approving the Hernandezes' application (which was signed with an "X" and not witnessed by two disinterested persons) one of the company's senior underwriters failed to follow company rules. *Id.* at 3609–10.

Other evidence presented at trial revealed that before the *Hernandez* suit was filed in April 1991, Dawson's successor, Terry Richards, received complaints about Oscar Herrera from at least

three other policyholders. Richards investigated the complaints and was convinced that Herrera had committed a fraud on each of the policyholders; and Richards repeatedly warned the home office about Oscar Herrera. Pl.'s Add'l Facts ¶ 79. In July 1990, Richards wrote to Michael Cincotta, who was then a supervisor in the home office Compliance Department, informing him of the complaints against Herrera and strongly recommending that New York Life take whatever action was necessary to terminate Herrera's employment. Cincotta did not respond and Herrera was not fired. *Id.* ¶ 80. Morrison testified that Cincotta's handling of these matters was unfortunate and a matter of concern. *Id.* ¶ 81. There was also testimony indicating that when the New York Life home office received a complaint from the Cruzes in August of 1989, "somebody didn't follow through." None of the home office personnel whom the evidence showed had failed to do their jobs were fired or disciplined as a result of their failures. *Id.* ¶ 84. Dawson cites all of the foregoing as evidence of misconduct at the home office in connection with the conduct of Oscar Herrera.

local management in preventing wrongdoing. Defs.' Facts ¶¶ 76–79.

Alice Kane gave a speech at the Managers' Meeting entitled "Corporate Responsibility is Everyone's Job." Kane's speech included the following comments concerning the *Hernandez* case:

Last month for the first time in our 150–year history, we were assessed punitive damages in a lawsuit.

... Did we "deserve" to be punished? Here are the facts.

. . . . .

... We need to realize that it wasn't the agent alone who cost us $15,000,000 in punitive damages. Mrs. Hernandez only lost $65,000. How then did we get from there to $15 million? Well, let me show you.

Before Terry Richards, there was a pattern of unethical behavior in the Corpus Christi office. It went well beyond this fraud. There was an attitude—encouraged by management—that rules were made to be broken—and shortcuts were meant to be taken.

There were unauthorized conversions, unwitnessed signatures and commission switching for Council credit. Windowing was almost commonplace. And leads were bought and sold. All of this was done with the knowledge—and sometimes the actual participation of—the local management.

In the jury's mind, these abuses went a long way to fill the gap from $65,000. As I said before, punitive damages are awarded when a jury is sending a message. This time it was loud and clear. We were wrong. Local management failed and we—the company—must take steps to correct it.

16. Specifically, Kane reviewed a trial exhibit entitled "Corpus Christi General Office Monthly Plan Notes, Oct. 4, 1991." Kane Aff. ¶ 11. The Monthly Plan Notes included the following comment:

[T]he Corpus Christi Office had the longest list of term conversion for Council in June 1990. We had the longest list in the W.A. and possibly the longest list in the company. In the past, this office has had a very, very loose

Defs.' Facts ¶ 80. Kane testified that when she referred to "management" and "local management" in her speech she was referring to Dawson, among others. Kane also testified that she believed that the audience so understood her references, "if they knew who the managers were at Corpus Christi." Kane Dep. at 86–89.

Kane's speech was drafted by an in-house speech writer, Lisa Frazier, in conjunction with New York Life's then Deputy General Counsel, Michael McLaughlin, Kane, and others. Defs.' Facts ¶ 81. Among other things, Frazier relied upon a 2½ page memorandum drafted by Taxerman, which set out a chronology of events in the *Hernandez* case. Pl.'s Add'l Facts ¶ 44. Kane also requested that the speech be reviewed by Taxerman. Defs' Facts ¶ 82. Taxerman attests that he reviewed Kane's speech for accuracy and believed that the challenged statements were true. Taxerman Aff. ¶ 5. Additionally, Kane was personally familiar with certain materials which she regarded as supporting her remarks about "local management," including: (i) the results of an audit of the Corpus Christi Office that found that Dawson was involved in unauthorized commission switching; (ii) a *Hernandez* trial exhibit that discussed the problems of windowing and term conversions in the Corpus Christi Office;[16] (iii) reports from Taxerman and Texas trial counsel in the *Hernandez* case about evidence concerning local management; (iv) the jury charge and the jury's findings in the *Hernandez* case as to "New York Life." Defs.' Facts ¶ 84. Kane also attested that she believed that the challenged statements were true and did not entertain any doubt as to their accuracy. Kane Aff. ¶ 34.

Kane also participated in a panel discussion on compliance issues at the 1993 Managers' Meeting.[17] During that discussion, she made the following extemporaneous remarks:

attitude regarding windowing signatures, having the guy say just sign it for me, etc.
Defs.' Appendix at A63.

17. Participating on the panel with Kane were: Lee Gammill, who was then an Executive Vice President; Lyle Paul, who was then the Senior Vice President in charge of the Agency Department; Richard Topp, an officer of NYLSEC; and Michael Cincotta, a corporate Vice President in the Agency Department. Defs.' Facts ¶ 90.

As I said, we are in a new ball game. What used to occur was that, if there had been some evidence of fraud committed by the agent and the agent committed a second fraud, we would be in a punitive damage situation like this. The shift that the *Hernandez* case basically takes us to, there was no prior evidence of Herrera ever committing a fraud. There were policy-holder complaints, but no actual fraud. And it was the lack of compliance in the office, total disregard of the rules with the, sometimes the actual knowledge and, certainly, the encouragement of local management; and that's where the ball game has shifted.

. . . . .

In the Hernandez case, we saw the local, practically everyone in the management chain was involved.

. . . . .

Windowing, the practice of forging signatures . . . was widespread.

Unauthorized conversions. What they used to do was shift the—they would convert a policy. And if the policyholder complained, they would reverse it; otherwise, they kept it on the books as a conversion.

. . . . .

What made matters worse is that we didn't fire the local management . . . sooner.

Kane Aff. ¶ 38. Kane attests that the bases for these remarks included the same information and sources upon which she relied in giving her prepared speech; and, Kane attests that she entertained no doubts as to the accuracy of these remarks and that she believed these remarks were true. *Id.* ¶¶ 39–40. Kane testified that she intended her references to "local management" and "the management chain" to refer to Dawson, among others, and that she believed that the audience so understood the references. Kane Dep. at 100.

Ironically, Cincotta was the supervisor in the home office's Compliance Department who failed to take action when Terry Richards wrote to the

### B. *Lyle Paul's Remarks*

Kane's remarks were echoed by Lyle Paul during the compliance panel discussion:

As Alice [Kane] pointed out, one of the problems in the Hernandez case was that the management team of that office at the time, not the current management team, but the team that was in there at the time this occurred, were doing some things, winking at some things, and, frankly, practicing some shortcut methods themselves. When they did that, it created an atmosphere that just communicated the idea that rules were meant to be broken.

Paul Dep. at 201–02. Paul testified that when referring to the "management team," he was referring to the team headed by Dawson and that he believed that the audience understood this. *Id.*

### C. *Lee Gammill's Speech*

Lee Gammill, who was then an Executive Vice President with New York Life, also spoke at the 1993 Managers' Meeting in both a prepared speech and during the compliance panel discussion. Gammill's prepared speech, entitled "Beyond Triple A," included the following remarks:

Last year, Alice Kane talked to you about the danger of lax supervision. The year before that, I talked to you about ethics. A few years before that, Harry talked to you about supervision and he specifically talked about the danger of a punitive damage judgment and at least one manager in that audience failed to take the words to heart. And the cost was dear.

On February 8th, a Texas court handed down a $16 million judgment against the company in an agent fraud case. $15 million of it was in the form of punitive damages. . . . All on a $65,000 actual damage claim.

The facts are simple enough. The agent had indeed perpetrated fraud. Worse yet, the managers in the office at the time failed to provide adequate supervision— adequate supervision. Even though the company acted swiftly—we offered to pro-

home office and recommended that Herrera be terminated. *See supra* note 15.

vide full compensation and damages once the facts came to light—we were sued and we lost.

Because of the dereliction of the managers in one office, in essence Individual Operations, everyone in this room, will have to work the first three-and-a-half months of this year just to make up the loss.

Defs.' Facts ¶ 87. Gammill testified that he intended the referent "one manager" in the first quoted paragraph to refer to Dawson and that he believed the audience at the Managers' Meeting knew who he was talking about. Gammill Dep. at 67. Similarly, Gammill testified that his other references to "managers" referred to Dawson, among others, and that he believed that the audience understood this. *Id.* at 68–69.

Gammill's speech had been prepared in conjunction with Kane's speech by a New York Life in-house speech writer and had been reviewed by Kane before he gave it. Defs.' Facts ¶ 88. Gammill had also had conversations with Kane, Taxerman, Morrison, and others about the evidence introduced in the Hernandez trial. Gammill attests that he did not entertain any doubts about the accuracy of his challenged statements and that he believed his remarks to be true. Gammill Aff. ¶ 16.

During the panel discussion on compliance, Gammill's remarks included the following:

I am really disappointed and, in fact, embarrassed. And I think you all are, too, that one of us, since I grew up with you, one of us really screwed up bad. I mean, when you look at the case, when you look at the depositions on this, you say, how in the world could this go off as far as it did.

And the second thing that comes to mind is just the word dumb. The type of thing that went on down in Corpus, you know, has to be caught sooner or later. And maybe the individuals down there had a death wish beyond bad judgment; but,

there is no way that this type of thing stays hidden.

. . . . .

You are very important people. If something is going to succeed, it succeeds because of the influence of the local manager. Unfortunately, if something is going to fail, we also get, as general managers, also get to take credit for that. And this was a lulu. .

Defs.'s Facts ¶ 96. Gammill testified that he intended to refer to Dawson, among others, and that he believed the audience understood this. Gammill Dep. at 86–87.

It is undisputed that neither Kane, Paul, nor Gammill personally reviewed the *Hernandez* trial transcripts before making their speeches at the Managers' Meeting. Defs.' Resp. Add'l Facts ¶ 52. Rather, they were informed about the trial testimony through their communications with Taxerman, Morrison, and Bryant, all of whom had first hand knowledge of the *Hernandez* testimony. *Id.* Nor did anyone from New York Life contact Dawson in an effort to verify the truth of the Managers' Meeting statements that were made about him. Pl.'s Add'l Facts ¶ 53. In this regard, New York Life notes that Dawson was not considered credible. Defs.' Resp. Add'l Facts ¶ 53. Nor did anyone from New York Life contact Oscar Herrera to try to learn whether Dawson was involved in the frauds that Herrera perpetrated against the New York Life customers. Pl.'s Add'l Facts ¶ 54. Nor did anyone from New York Life contact attorney Frank Herrera (the Hernandezes' lead counsel—who is unrelated to Oscar Herrera) in order to inquire as to whether Dawson was involved in the frauds Oscar Herrera perpetrated against New York Life customers.[18] *Id.* ¶ 55.

## II. The Training Videotape

After the Managers' Meeting, New York Life organized a compliance program for all of its general offices. A videotape on corporate responsibility and an accompanying program were sent to each of New York Life's

---

18. New York Life notes, however, that at the time the speakers were preparing their remarks for the Managers' Meeting, New York Life was still in an adversarial relationship with attorney Herrera. Defs.' Resp. Add'l Facts ¶ 55.

approximately 181 general offices nationwide for use in training agents and employees. Agents were required to certify in writing that they viewed the videotape, otherwise they were not allowed to sell New York Life policies. Defs.' Facts ¶ 98; Pl.'s Add'l Facts ¶ 31. The corporate responsibility videotape incorporated some of the remarks made at the Managers' Meeting, including the excerpts from Kane's speech about the *Hernandez* case and Paul's remarks at the panel discussion quoted above.

### III. The Form U–5 and Amended Forms U–5

#### A. *The Original Form U–5*

On February 25, 1993, shortly after firing Dawson, NYLSEC sent a Form U–5 ("Uniform Termination Notice For Securities Industry Registration") to the NASD concerning Dawson's termination. Robert Galler, a NYLSEC officer, prepared the Form U–5. He had been informed by New York Life agency personnel that Dawson had violated New York Life's rules and procedures. In response to the Form U–5 query concerning the reason for the termination of Dawson's securities registration, Galler responded, "Failure to follow rules and procedures of New York Life Insurance Company. No securities involved." Def.'s Facts ¶ 63. Dawson has admitted that he "failed to follow New York Life's rules and procedures concerning commission switching." Dawson Dep. at 89–90.

#### B. *The Amended Forms U–5*

On or before February 24, 1993, New York Life received two letters from the law offices of Frank Herrera Jr. (who was the Hernandezes' lead counsel). One demanded $10 million to settle a complaint against New York Life by Richard and Veronica Cruz arising

out of Oscar Herrera's alleged unauthorized conversion of the Cruzes' term insurance policy. The other demanded $10 million to settle a similar complaint by Wesley and Dorothy Herring. Pl.'s Add'l Facts ¶ 90.

Attorney Herrera's demand letter concerning the Cruz matter included the following statements:

> As you may be aware, testimony in the *Lamar Hernandez v. New York Life* case, directly implicates New York Life and its management in the fraud perpetrated on the Cruz family. The evidence shows that Associate General Manager Dale Gillum told agent Herrera to forge the application in the conversion forms. Moreover, the evidence showed that General Manager Ron Dawson condoned forgery for conversion, informing his agents that 'if they were caught, they could simply reverse the conversions and reimburse the insureds.' Finally, General Manager Terry Richards, although fully aware of the forgery of the Cruz policy and other policies forged by agent Herrera, failed to terminate agent Herrera and failed to properly report agent Herrera to the State Board of Insurance. Mr. Richards and other members of management, furthermore, directly benefitted from the forgery in that their compensation packages were positively affected by the fraud. Finally, New York Life knowingly sent false information to the State Board of Insurance when they reported that reversal of the Cruz policy was solely for business purposes, and reported that there was no evidence of wrongdoing on the part of New York Life.

Pl.'s Appendix at T408. Attorney Herrera's demand letter concerning the Herring matter contained identical statements as to what the *Hernandez* evidence purportedly showed about Dawson.[19] *Id.* at 414.

---

19. In connection with the present litigation, Attorney Herrera has submitted an affidavit in which he states:

I did not present in the *Hernandez* trial evidence that Mr. Dawson condoned or participated in the fraud perpetrated on Mr. and Mrs. Cruz.

. . . . .

The ... Cruz demand letter contains the quoted phrase, "if they were caught, they could

simply reverse the conversions and reimburse the insureds." This sentence reads as though Ron Dawson spoke the quoted words. In fact, however, the quoted phrase summarized testimony given at the *Hernandez* trial by Former New York Life agent Osvaldo "Sonny" Correa.... There was no evidence at trial from Mr. Correa or any other witness that Mr. Daw-

On March 2, 1993, after New York Life received the Cruz and Herring letters, NYL-SEC prepared an amendment to Dawson's Form U-5. Taxerman assisted Galler—who had never seen the Cruz demand letter—in preparing the amendment; and it was Taxerman who drafted the language of the amended Form U-5. Pl.'s Add'l Facts ¶ 94. In item 7 of the Disclosure Reporting Page (DRP-5) appended to the amended Form U-5, Taxerman reported the allegations of the Cruz demand letter:

> 7. What were the allegations against the individual? (Include amounts of actual or alleged damages or claims.)
>
> Allegedly condoned forgery of customer's name to pay $300 premium needed to convert term insurance policy to whole life and condoned other alleged forgeries. Allegedly informed persons who committed the forgery in the Cruz matter that if detected they would not be reported to proper authorities.

Defs.' Facts ¶ 69; Pl.'s Add'l Facts ¶ 95.

At the time that New York Life received the Cruz demand letter, New York Life home office personnel had a transcript of Sonny Correa's *Hernandez* testimony, and were familiar with the Cruz complaint, which was first made in August 1989, and which had been the subject of testimony in the *Hernandez* trial. Pl.'s Add'l Facts ¶ 101. It is undisputed that Taxerman and Galler did not review a file that New York Life had maintained on the Cruz matter ever since Mr. and Mrs. Cruz first complained about Herrera in 1989, did not contact the law offices of Frank Herrera, and did not attempt to obtain any response or explanation from Dawson before preparing the amended Form U-5. It is also undisputed that Galler did not review transcripts or exhibits from

the *Hernandez* trial. Pl.'s Add'l Facts ¶ 102. Taxerman testified that he did not refer to the *Hernandez* trial transcripts prior to drafting the response contained in item 7, but he indicated that such a review was unnecessary because the trial had just ended. Taxerman Dep. at 191. It is also undisputed that the statement in the Cruz demand letter that Dawson informed his agents "that if they were caught they could simply reverse the conversions and reimburse the insured" misstated the trial testimony of Sonny Correa. Pl.'s Add'l Facts ¶ 103. Finally, it is undisputed that although the Cruz and Herring demand letters contained statements about what the *Hernandez* evidence revealed about Gillum's and Richards' complicity in Oscar Herrera's frauds, NYLSEC did not file amended Form U-5s as to these two former registered employees, Pl.'s Add'l Facts ¶¶ 104, 105; however, defendants represent that "NYLSEC did not know of the allegations against Gillum and Richards on or before March 2, 1993." Defs.' Resp. Add'l Facts ¶ 107; *see also id.* ¶ 106.[20]

On May 4, 1993, New York Life settled four complaints with policyholders. It settled the *Hernandez* claim (while an appeal was pending) for $12.5 million; the Herring claim for $5.25 million; the Cruz claim for $250,000; and a claim brought by the estate of another policyholder (Sanchez) for $250,000. John O'Byrne completed a second amended Form U-5 concerning Dawson on October 27, 1994, noting that the Cruz complaint was "Resolved" on May 4, 1994. Defs.' Appendix at A312. In the seconded amended Form U-5, O'Byrne repeated verbatim the description of the allegations against Dawson contained on the first amended Form U-5. *Id.* O'Byrne also noted:

---

> son actually made the remarks quoted in the Cruz Demand Letter.
>
> . . . . .
>
> As was true with respect to statements about Mr. Dawson in the Cruz Demand Letter, there was no evidence presented in the *Hernandez* trial that Mr. Dawson condoned, participated in or had any knowledge of the fraud perpetrated by Oscar Herrera on Mr. and Mrs. Herring. I was not aware of any facts which link Mr. Dawson to the Herring fraud in any way.
>
> F. Herrera Aff. ¶¶ 8, 10, 15.

**20.** This representation by the defendants is somewhat of a leap from the evidence in the record upon which they rely to support it. John O'Byrne, a Vice President of New York Life and Vice President and Chief Compliance Officer of NYLSEC, simply testified that the fact that Taxerman helped Galler complete the amended Form U-5 and the fact that Taxerman relied on attorney Herrera's demand letter as a source of information for the response to item 7, did not mean that NYLSEC had knowledge of the contents of the Cruz demand letter. O'Byrne Dep. at 203.

Copies of the [Cruz] customer complaint and settlement agreement, as well as related complaints and settlement agreements, are attached. NOTE: Mr. Dawson has sued New York Life alleging among other things that his termination was unlawful and that his Form U–5 and Amended Form U–5 are false and defamatory.

*Id.* O'Byrne attached the complaint and settlement agreement in the Cruz case, as well as complaints and settlement agreements relating to the Hernandezes' claims, the Herrings' claims, and the Sanchez estate's claims, which were described as "related complaints and settlement agreements" on the second amended Form U–5. *Id.* On December 5, 1994, Dawson received notification from the NASD that NASD had completed an investigation into the circumstances disclosed in the second amended Form U–5 and had determined that no action against Dawson was warranted and that the matter was being closed. Pl.'s Add'l Facts ¶ 119.

O'Byrne filed a third amended Form U–5 concerning Dawson on the same day that he filed the second amended Form U–5, reporting a civil petition that Oscar Herrera's parents filed in Texas state court against New York Life for misrepresentation and misappropriation of funds from several annuities and insurance policies. Defs.' Facts ¶ 72–74. Although Dawson was not named as a defendant in the Herrera's civil petition, *id.* at A340, the civil petition alleged, among other things, that:

With full knowledge that Defendant Herrera has depleted the accounts of several other New York Life–Annuity clients, neither Defendant New York Life–Annuity, Defendant Ernest Espino, Terry Richards, or Ronald Dawson ever took steps to warn or otherwise protect Plaintiffs or their ... retirement fund.... Furthermore, agents Terry Richards and Ronald Dawson were supervising the activities of Defendant Herrera and thereafter Defendant Espino; agents Terry Richards and Ronald Dawson, acting in their managerial role, both wholly failed to take steps to protect the interests of Plaintiffs.

Defs.' Appendix at A343–44, A346–47, A349–52, A354. The demand letters sent to New York Life by the Herreras' attorney also contend that Dawson was aware of Oscar Herrera's action and did not try to stop him or warn the Herreras. *See, e.g., id.* at A329, A331, A334, A337. The third amended Form U–5 that O'Byrne submitted to the NASD summarized and quoted from the Herrera's civil petition, and included the petition as an attachment. Defs.' Facts ¶ 74. Specifically, the third amended Form U–5 states: "Cust. alleged misrepresentation and misappropriation against agent Oscar Herrera Jr. Customer alleged that 'with full knowledge that defendant Herrera has depleted the accounts of several other NYL—Annuity clients, neither NYLIFE–Annuity, [other NYL Mgrs. & Agents] or Agent Ronald Dawson ever took steps to warn or otherwise protect plaintiffs.' " Defs.' Appendix at A327.

## ANALYSIS

Dawson's Amended and Supplemental Complaint alleges eight claims. Counts I–V allege defamation. Count I is based on statements made in Dawson's original Form U–5 and amended Form U–5; Count II is based on the second amended Form U–5; and Count III is based on the third amended Form U–5. Count IV alleges defamation arising out of the statements made by Kane, Gammill, and Paul at the 1993 Managers' Meeting; and Count V is based on the compliance training videotape, which republished statements made at the Managers' Meeting. Count VI alleges intentional interference with prospective economic advantage. Count VII alleges intentional infliction of emotional distress. Count VIII alleges breach of contract in connection with an alleged oral agreement concerning Dawson's compensation. Defendants maintain that all of the allegedly defamatory statements are protected by established privileges and are not actionable, and that Dawson's intentional interference, intentional infliction, and breach of contract claims fail as a matter of law. We address New York Life's arguments, in turn, below.

*Summary Judgment Standards*

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the nonmoving party, and draw all inferences in the nonmovant's favor. *Wolf v. Buss America, Inc.*, 77 F.3d 914, 918 (7th Cir.1996); *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995). However, if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1212 (7th Cir.1993). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. at 2513–14.

## I. DEFAMATION CLAIMS

*Defamation and Qualified Privilege*

■ New York Life maintains that all of the challenged statements in Counts I–V are conditionally privileged because sufficiently important interests of New York Life, its managers, and its policyholders and potential customers were involved. Indeed, Illinois defamation law [21] recognizes that certain occasions or circumstances may give rise to a qualified privilege to make otherwise actionable defamatory remarks without liability.[22] *See Kuwik v. Starmark Star Marketing & Admin. Inc.*, 156 Ill.2d 16, 24, 188 Ill.Dec. 765, 769, 619 N.E.2d 129, 133 (1993) ("A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, might be defamatory and actionable.") (internal quotation marks and citations omitted); *see also Larson v. Decatur Memorial Hosp.*, 236 Ill. App.3d 796, 799, 176 Ill.Dec. 918, 921, 602 N.E.2d 864, 867 (4th Dist.1992) ("An otherwise defamatory statement is not actionable if made under a qualified privilege.").

In *Kuwik*, the Illinois Supreme Court expressly recognized the existence of conditionally privileged occasions where: "some interest of the person who publishes the defamatory matter is involved"; "some interest of the person to whom the matter is published or of some other third person is involved"; and where "a recognized interest of the public is concerned." *Kuwik*, 156 Ill.2d at 29, 188 Ill.Dec. at 771, 619 N.E.2d at 135. In the present lawsuit, Dawson concedes, as he must, that all the challenged statements in Counts I–V are conditionally privileged. *See* Pl.'s Mem. at 19, 46. He contends, however, that defendants have forfeited their privilege by abusing it.

*Abuse of the Privilege*

■ Even a privileged communication may be actionable if the publisher abuses its

---

**21.** The parties do not dispute, and this Court expressly finds, that Illinois law governs Dawson's defamation claims. *See Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 916 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1964, 131 L.Ed.2d 855 (1994).

**22.** As a general matter, to prevail on a defamation claim, a plaintiff must prove "that the defendants made a false statement concerning him, that there was an unprivileged publication to a third party with fault by the defendant[s], which caused damage to the plaintiff." *Krasinski v.*

*United Parcel Serv., Inc.*, 124 Ill.2d 483, 490, 125 Ill.Dec. 310, 313, 530 N.E.2d 468, 471 (Ill.1988); *Pandya v. Hoerchler*, 256 Ill.App.3d 669, 673, 195 Ill.Dec. 576, 580, 628 N.E.2d 1040, 1043 (1st Dist.1993). "A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 10, 180 Ill.Dec. 307, 312, 607 N.E.2d 201, 206 (Ill.1992).

privilege. *Barakat v. Matz*, 271 Ill.App.3d 662, 208 Ill.Dec. 111, 118, 648 N.E.2d 1033, 1040 (1st Dist.1995). The question of whether a qualified privilege has been abused is a question of fact for the jury to decide. *Kuwik*, 156 Ill.2d at 27, 188 Ill.Dec. at 770, 619 N.E.2d at 134; *Girsberger v. Kresz*, 261 Ill. App.3d 398, 415, 198 Ill.Dec. 940, 953, 633 N.E.2d 781, 794 (1st Dist.1994).[23] Dawson maintains that a genuine issue of material fact exists as to whether New York Life abused its privilege. Under familiar summary judgment standards, this Court must not take the abuse of privilege determination out of the hands of the jury unless the evidence in the record so unequivocally demonstrates the absence of abuse that no reasonable jury could return a verdict in favor of Dawson.

■ Before delving into this abuse of privilege analysis, it will be helpful to step back and examine the Illinois Supreme Court's holdings in *Kuwik* because that opinion quite clearly altered the landscape of qualified privilege law. *See Girsberger*, 261 Ill.App.3d at 415, 198 Ill.Dec. at 953, 633 N.E.2d at 794 ("We note that the law of qualified privilege was recently altered by our supreme court in *Kuwik*."). Under Illinois law prior to *Kuwik*, the determination as to whether a qualified privilege existed (a question of law for the Court to decide), included consideration of the following elements (1) the defendant's good faith in making the challenged statement; (2) the interest or duty to uphold in making the statement; (3) whether the statement was properly limited in its scope to that purpose; (4) whether it was a proper occasion for the statement; and (5) whether the statement was made in a proper manner and to proper parties only. *See Kuwik*, 156 Ill.2d at 25, 188 Ill.Dec. at 769, 619 N.E.2d at 133; *Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 349, 243 N.E.2d 217 (1968); *Mittelman v. Witous*, 135 Ill.2d 220, 236–37, 142 Ill.Dec. 232, 552 N.E.2d 973 (1989). In *Kuwik*, the court abandoned the foregoing ap-

proach and adopted that of the Restatement (Second) of Torts. Under the Second Restatement's approach, "a court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged." *Kuwik*, 156 Ill.2d at 27, 188 Ill.Dec. at 770, 619 N.E.2d at 134.

The court noted that under this newly adopted approach, factual inquiries that had previously been made by the court as part of the initial privilege determination—most notably, whether the speaker acted in good faith in making the defamatory statement—are now placed "into the hands of the jury to be determined as questions of fact" as part of the abuse of privilege determination. *Id.* It is significant to observe for present purposes that as a result of its newly adopted approach, the *Kuwik* court recognized that the jury's abuse of privilege inquiry must be broadened. As the court explained:

In *Mittelman* [*v. Witous*, 135 Ill.2d 220, 142 Ill.Dec. 232, 552 N.E.2d 973 (1989)], this court held that actual malice must be proven by a minimum standard of recklessness once the qualified privilege has been established by the defendant. This inquiry was limited, however, to whether a defendant knew the matter was false or had a high degree of knowledge that the matter was false. Because we now omit several factual inquiries from the former test for the qualified privilege and place them in the hands of the jury, we must expand the definition of abuse of a qualified privilege. We now hold that to prove an abuse of the qualified privilege, the plaintiff must show a direct intention to injure another, or ... a reckless disregard of the defamed party's rights and of the consequences that may result to him. Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights,

---

23. The Seventh Circuit has also noted on several occasions that the abuse of privilege issue is one of fact for the jury. *See, e.g., Babb v. Minder*, 806 F.2d 749, 753 & n. 1 (7th Cir.1986) ("The question of whether the defendant abused the privilege is a factual issue for the jury"); *Kennedy v.*

*Children's Serv. Soc'y*, 17 F.3d 980, 985 (7th Cir.1994) (applying Wisconsin defamation law and noting "Abuse of conditional privilege is a jury question unless the facts are such that only one conclusion can be reasonably drawn.") (internal quotation marks and citation omitted).

including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material only to the proper parties.

*Kuwik,* 156 Ill.2d at 30, 188 Ill.Dec. at 771–72, 619 N.E.2d at 135–36.

In light of the foregoing language, it is clear that *Kuwik* expanded the range of conduct that can defeat a qualified privilege: "we must expand the definition of abuse of a qualified privilege." As an Illinois appellate court recently observed, "*Kuwik* would make it easier for a jury to consider whether defendant's publication was reckless, lacked good faith or lacked justification." *Girsberger,* 261 Ill.App.3d at 415, 633 N.E.2d at 795. The inquiry is broadened beyond *Mittelman's* examination of "whether a defendant knew the matter was false or had a high degree of knowledge that the matter was false," and now includes any "reckless act which shows a disregard for the defamed party's rights."

■ New York Life cites *Harrel v. Dillards Dep't Stores, Inc.,* 268 Ill.App.3d 537, 205 Ill.Dec. 892, 644 N.E.2d 448 (4th Dist. 1994), *appeal denied,* 162 Ill.2d 567, 209 Ill. Dec. 801, 652 N.E.2d 341 (1995), for the proposition that *Kuwik* did not change the standard enunciated in *Mittelman.* Indeed, not only does *Harrel* reiterate the *Mittelman* standard, but it turns *Kuwik* on its head and reads *Kuwik* as *increasing* the showing required of the plaintiff:

24. We note that *Harrel* engenders some confusion by framing the question as whether "actual malice" still applies. This Court believes that the real issue is whether *Kuwik* broadened the scope of conduct encompassed by the term "actual malice" beyond that articulated in *Mittelman.* And, the language of *Kuwik* is quite clear on this point. Immediately after describing *Mittelman's* definition of the required showing, the *Kuwik* court stated: "Because we now omit several factual inquiries from the former test for the qualified privilege and place them in the hands of the jury, we must expand the definition of abuse of a qualified privilege." Specifically, because *Kuwik* removed the "good faith" determination from the initial inquiry as to whether a statement is privileged and put that determination into the hands of the jury as part of the "abuse" inquiry, the court necessarily broadened the abuse standard to include "reckless disregard of the defamed party's rights and of the consequences that may result to him." After *Kuwik,*

*Kuwik* increased the burden of proof previously described in *Mittelman* . . . . A careful reading of *Kuwik* indicates that "actual malice" still applies, since the supreme court stated it was expanding the definition of abuse of a qualified privilege from the minimum standard of recklessness established in *Mittelman.* Thus, in order to prove that there has been an abuse of a qualified privilege, some degree of evil intent, ill will, or spite by the defamer toward the defamee must be shown.

*Harrel,* 644 N.E.2d at 452. We respectfully disagree. Instead, we concur with the *Girsberger* court's construction of *Kuwik* as "broaden[ing] the definition of abuse of a qualified privilege." 261 Ill.App.3d at 415, 633 N.E.2d at 794.[24] Thus, this Court will not require a finding of "evil intent, ill will, or spite by the defamer toward the defamee" in order to find that a qualified privilege has been abused, as New York Life suggests. Instead, we will follow *Kuwik's* instruction that: "an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights."

## Counts IV and V: Managers' Meeting and Training Videotape Remarks

■ With these standards in mind, we now consider if a genuine issue of material fact exists as to whether New York Life abused its qualified privileges in making its statements at the 1993 Managers' Meeting and compliance training videotape.[25]

an abuse (*i.e.,* actual malice) can be found not only where there is reckless disregard of probable falsity but also reckless disregard of the defamed party's rights as evidenced by such conduct as failing to conduct a proper investigation. Moreover, where a jury could reasonably find that the defendant failed to conduct a proper investigation into the truth or falsity of its statements, it might also conclude that the defendant acted with reckless disregard of probable falsity.

25. Defendants have not argued whether the innocent construction rule has any application to Dawson's defamation *per se* claims, which are based on statements made at the Managers' Meeting and repeated in New York Life's compliance training videotape. As explained by the Seventh Circuit:

Courts used to strain to find that a defamatory statement that did not actually name the plaintiff might reasonably be understood to be

This whole issue really boils down to whether a jury could reasonably find that New York Life recklessly failed to conduct a proper investigation into whether Dawson had knowledge of, condoned, or participated in, fraud or forgery before making statements attributing such knowledge or participation to him. New York Life repeatedly emphasizes that the challenged statements were based upon knowledge of certain evidence presented at the lengthy *Hernandez* trial, and that Taxerman, Bryant (the local *Hernandez* trial counsel), and Morrison (New York Life's representative at the trial) were all consulted as to the accuracy of the challenged statements. However, in light of the following considerations, we believe that a jury could reasonably find this to be a recklessly insufficient investigation into whether Dawson had the knowledge attributed to him.

In the first place, a jury could reasonably find that the evidence presented at the *Hernandez* trial was insufficient to justify attributing knowledge of, or participation in, fraud and forgery to Dawson. Although Oscar Herrera readily attributed knowledge of and/or participation in several of his frauds to Dale Gillum, his testimony was silent as to whether Dawson had any knowledge of the Hernandez fraud—or any other of Herrera's admitted frauds. There is no evidence in the record that New York Life's counsel ever questioned Herrera as to whether Dawson had knowledge of his frauds and forgeries. Indeed, it is undisputed in the present action that "Oscar Herrera did not directly testify that Dawson knew of or participated in the Hernandez fraud, the Cruz forgery, windowing or any other fraud or forgery Herrera

committed." Defs.' Resp. Add'l Facts ¶ 56. And, Morrison's trial notes from a day on which Herrera was testifying state: "No one else except Gillum knew of the fraud *re* Herring, Lopez, Cruz, Clark, *etc.*" Pl.'s Appendix at T529.[26] While we discuss other evidence from the *Hernandez* trial relating to Dawson's knowledge of or participation in fraud and forgery in the next section of this opinion (wherein we conclude that a jury could conclude that the challenged statements were not a fair report of the *Hernandez* proceedings), our point here is that the mere fact that there was a lengthy trial in the *Hernandez* case says very little about New York Life's investigation into the truth or falsity of its statements regarding Dawson—particularly where there is some suggestion in the trial testimony that Dawson *did not* know about the major frauds discussed in that trial. While New York Life endeavors to point to a mass of trial evidence implicating Dawson's knowledge and participation in fraud, a jury could reasonably find that that evidence is at best suggestive, and that New York Life was reckless not to conduct a more probing and independent inquiry before attributing knowledge and/or participation in fraud and forgery to Dawson based on that evidence.

New York Life also argues that as a matter of law Kane, Gammill, and Paul, cannot be found to have acted recklessly because they relied on input from Taxerman, Bryant, Morrison, and others in making their remarks. New York Life contends that as a matter of law it cannot be reckless for a corporate officer to rely on the reports and conclusions of the company's lawyers in making statements about a lawsuit. We do not

about someone else; this was the "innocent construction" rule. But in modern law it is enough if the audience would be likely to think that the defendant was talking about the plaintiff. Whether it would think that or not is treated by the Illinois courts as a question of law, to be decided by the judge. *Desnick v. American Broadcasting Cos.*, 44 F.3d 1345, 1349 (7th Cir.1995). In view of defendants' admission that Kane, Gammill, and Paul intended their remarks to refer to Dawson and believed them to be so understood, this Court will not invoke the innocent construction rule *sua sponte*. However, at trial defendants will be free to argue and attempt to prove that the defamatory meaning that Dawson attributes to

these speakers' statements was not the meaning given to the words by the audience. Of course, Gammill's remarks specifically refer to "one manager" and "one of us" and hence an innocent construction may be less plausible there than is the case with Kane's and Paul's remarks, which referred to "local management" and similar expressions.

**26.** During his deposition for this lawsuit, Morrison testified that he could not recall whether this note reflected Herrera's testimony or a statement made by Herrera's counsel. Pl.'s Appendix at T198–203.

agree that the issue can always be decided in such a broad stroke.

■ The question of whether a qualified privilege has been abused must rest on an examination of the particular facts of any given case. *Girsberger*, 261 Ill.App.3d 398, 198 Ill.Dec. at 953, 633 N.E.2d at 794. In the instant case, this Court has carefully reviewed the various materials upon which Kane, Gammill and Paul say they relied and we are unable to conclude that no reasonable jury could find recklessness. Much of the cited material merely contains vague and nonspecific comments concerning "management," not particularized references to Dawson's knowledge of, or participation in, fraud and forgery. For instance, a draft outline for Kane's presentation to the Board of Directors, which was prepared with the assistance of Taxerman, includes the following entry:

> [T]there was evidence of management failures in the Corpus Christi Office. In the course of the litigation there was evidence against three other management personnel in the office: Ron Dawson ... Ron Gillam [sic] ... and Richard Miller.... There was evidence of knowledge of Herrera's improper practices including windowing and policy switching. Herrera testified that he did alter the policy and switch it but testified that the management of the Corpus Christi Office was aware of it. Each of the managers implicated the other two managers in knowledge of Herrera's practices.

Pl.'s Appendix at T765. All that can really be gleaned from this passage is that there was evidence that *someone* knew and that everyone was pointing their fingers in another direction. A reasonable jury reviewing this document could easily conclude that it was reckless of Kane and Taxerman to attribute knowledge of fraud to Dawson without further independent inquiry. The passage almost screams out for further investigation in order to get to the bottom of who knew what. We place no special weight on this particular document, but use it because it is representative of the generality and lack of particularization in the material presented to Kane, Gammill and Paul.

Without laboring over each and every piece of data, suffice it to say that we find that a jury could find reckless indifference in not conducting further independent investigation.

New York Life cites *Dark v. United States Fidelity & Guar. Co.*, 175 Ill.App.3d 26, 124 Ill.Dec. 681, 529 N.E.2d 662 (1st Dist.1988) in support of its argument that it was not reckless to rely on these reports and conclusions rather than expecting the speakers to have personal knowledge of the trial testimony. In *Dark*, the defendant, an insurance company, had denied a property damage claim and published its statement that the denial was based on the determination that the property damage was the result of a fire intentionally set by the insured or one of its agents. The trial court directed a verdict for the defendant as to the insured's libel claim, finding the statement to be privileged and that the plaintiff had not presented sufficient evidence to establish malice. In affirming this decision, the Illinois appellate court noted:

> Defendants' [sic] retained and relied on the advise [sic] of uninterested experts: Ronald Rozak to investigate the cause and origin of the fire; Metropolitan Chicago Loss Bureau to advise as to the course and progress of the investigation; and the Clausen Miller law firm to conclude the investigation and advise USF & G as to its legal rights and duties regarding the claim.

175 Ill.App.3d at 37, 124 Ill.Dec. at 689, 529 N.E.2d at 670. The opinion goes on to note that the defendants interviewed the fire chief who indicated that he suspected arson, and a detective who also stated that he believed the fire was intentionally set. On these facts the court rejected the plaintiff's contention that the defendant had failed to properly investigate. *Dark* is distinguishable from the instant case in a very fundamental respect: The defendants in *Dark* relied on "uninterested experts" who conducted an investigation, whereas in the instant case Kane, Gammill and Paul relied on their own subordinates (Taxerman and Morrison) and the lead trial counsel hired by New York Life to try the *Hernandez* case, all of whom can hardly be considered disinterested. Additionally, it is apparent

that the defendant in *Dark* did conduct some investigation on its own (such as interviewing the fire chief and a detective), whereas here the speakers completely failed to have someone not connected with the *Hernandez* trial review the trial evidence before purporting to speak in conclusive terms about what the evidence showed. And, the evidence that even those connected with the trial actually reviewed the evidence is scant. Thus, the jury could find that Kane, Gammill and Paul took recklessly insufficient steps toward verifying the information that was being relayed to them.

After evaluating the evidence under the appropriate standards, we must hold that on the present record a jury could find recklessness in the speaker's reliance on the reports and conclusions of Messrs. Taxerman, Bryant, Morrison, and others. We believe that a factfinder can and should be entitled to evaluate the content of such reports and conclusions and ask whether or not they are so vacuous, equivocal, or otherwise uninformative that only through recklessness would the recipient not conduct further inquiry before attributing knowledge or participation to Dawson. For all of the foregoing reasons, to the extent that it is based on qualified privilege, New York Life's motion for summary judgment on Counts IV and V is denied.

*The Fair Report Privilege*

In addition to the qualified privileges discussed above, New York Life also invokes what it terms the "fair report of judicial proceedings" privilege in seeking summary judgment on Counts IV and V. Dawson maintains that a genuine issue of fact exists as to whether New York Life's statements were a "fair and accurate" report of the *Hernandez* trial entitling New York Life to the protection of the privilege.

■ "Illinois recognizes a privilege for fair and accurate summaries of, or reports on, government proceedings and investigations." *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 270 (7th Cir.1983); *see Lulay v. Peoria Journal–Star, Inc.*, 34 Ill.2d 112, 214 N.E.2d 746 (1966) (recognizing the privilege).[27] However, Illinois appellate courts have consistently held that the fair report privilege does not extend to a reporter's inferences drawn from the public record. As the court explained in *Berkos v. National Broadcasting Co.*, 161 Ill.App.3d 476, 113 Ill.Dec. 683, 515 N.E.2d 668 (1st Dist.1987):

> [I]n order to properly invoke the privilege, it is a necessary predicate that the media's defamatory statement about the plaintiff be found in the public record or proceeding to which the privilege is sought to be attached; if the defamatory matter does not appear in those public records or proceedings, the privilege of fair and accurate report of public records does not apply....
>
> ... The common law fair report privilege does not attach to [the reporter's] utterance and publication of [his] inference.

*Id.*, 161 Ill.App.3d at 492–93, 113 Ill.Dec. at 692, 515 N.E.2d at 677–678; *see also Lowe v. Rockford Newspaper, Inc.*, 179 Ill.App.3d 592, 597, 128 Ill.Dec. 367, 371, 534 N.E.2d 549, 553 (2d Dist.1989) (finding the fair report privilege improperly invoked where news report contained statements not contained in police report of incident).

■ This Court finds that the statements made at the 1993 Managers' Meeting and in the compliance training videotape cannot fairly be characterized as reports of matter appearing in public records or proceedings. Rather, the challenged remarks constitute inferences—adverse to Dawson concerning

---

**27.** In *Lulay*, the Illinois Supreme Court recognized § 611 of the Restatement of Torts as expressing "the prevailing, if not unanimous, weight of judicial authority." 34 Ill.2d at 115, 214 N.E.2d at 748. Section 611 provided, in pertinent part:

> The publication of a report of judicial proceedings ... is privileged, although it contains matter which is false and defamatory, if it is (a) accurate and complete or a fair abridgment of such proceedings, and (b) not made solely for

the purpose of causing harm to the person defamed.

RESTATEMENT OF TORTS § 611 (1938). The Restatement (Second) of Torts deleted section (b) and provides:

> The publication of defamatory matter concerning another in a report of an official action or proceeding ... is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

RESTATEMENT (SECOND) OF TORTS § 611 (1977).

the scope of his participation in the *Hernandez* fraud and other misconduct—drawn from the *Hernandez* testimony and verdict by Taxerman, Kane, and others. To the extent that the challenged remarks were intended to refer to Dawson, they were not reported simply as certain witnesses' testimony; rather, the remarks were presented as the facts of the *Hernandez* case, explaining the multimillion dollar punitive damage award. There is simply nothing in the public record indicating that the punitive damage award was predicated on a specific finding that Dawson knew of, condoned, or participated in policyholder fraud or forgery.

Accordingly, we find that defendants' invocation of the fair report privilege for these challenged statements is improper and unavailing.

█ Moreover, even if the privilege were properly invoked, we would readily conclude (and do so conclude as an alternative basis for denying defendants' motion to the extent that it is based on the fair report privilege) that there is a genuine issue of material fact as to whether defendants have forfeited the privilege. The fair report privilege is forfeited if the report is not a fair and accurate report of the proceeding. *Tunney v. American Broadcasting Co.,* 109 Ill.App.3d 769, 775, 65 Ill.Dec. 294, 298, 441 N.E.2d 86, 90 (1st Dist.1982) ("The privilege is lost ... if the report of the proceeding is inaccurate"); *O'Donnell v. Field Enters., Inc.,* 145 Ill. App.3d 1032, 1036, 96 Ill.Dec. 752, 756, 491 N.E.2d 1212, 1216 (1st Dist.1986) ("when a news media account is neither complete nor a fair abridgment of the proceedings, then the privilege is lost"); RESTATEMENT OF TORTS § 611, cmt. d ("The rule stated in this Section requires the report to be accurate.... Not only must the report be accurate but it must be fair."); RESTATEMENT (SECOND) OF TORTS § 611, cmt. a ("The privilege ... is not an absolute privilege.... Abuse of the privilege takes place ... when the publisher does not give a fair and accurate report of the proceeding."); *id.* cmt. f.

█ In this regard, a report or summary of proceedings is "fair" where "the overall impression created by the summary [is] no more defamatory than that created by the original." *Brown & Williamson,* 713 F.2d at 270 (citing RESTATEMENT (SECOND) OF TORTS § 611, cmt. f); *see also id.* at 271 ("An unfair summary in the present context is one that amplifies the libelous effect that publication of the government report verbatim would have on a reader who read it carefully—that carries a greater 'sting' "); *Dolatowski v. Life Printing & Publishing Co.,* 197 Ill. App.3d 23, 27, 143 Ill.Dec. 757, 759, 554 N.E.2d 692, 694 (1st Dist.1990) ("If the gist or sting of the defamation in the official report is the same as the gist or sting in the news account then the news item is a fair abridgment of the proceedings and is covered by the privilege."); *Tunney,* 109 Ill.App.3d 769, 775, 65 Ill.Dec. 294, 298, 441 N.E.2d 86, 90 (same). Whether a report is fair and accurate is a question of fact to be determined by the jury, *Brown & Williamson,* 713 F.2d at 270–71; *Tunney,* 109 Ill.App.3d at 776, 65 Ill.Dec. at 298, 441 N.E.2d at 91; and, to paraphrase the Seventh Circuit in *Brown & Williamson,* unless the fairness of New York Life's statements emerges so incontrovertibly from a comparison of those statements with the evidence from the *Hernandez* trial, so that no rational jury could consider the statements unfair, summary judgment must be denied.

█ Guided by the foregoing standards, we find it evident that a genuine issue of material fact exists as to whether New York Life's statements at the 1993 Managers' Meeting and republished in the compliance training videotape are fair abridgments of the *Hernandez* proceedings. Construing New York Life's statements in the light most favorable to Dawson's position in this litigation, we find that a jury could reasonably conclude that the gist or sting of those statements was that Dawson knew of, participated in, or encouraged acts of forgery or fraud. In order to determine whether New York Life has forfeited its fair report privilege, we must examine whether the *Hernandez* proceedings carried this same sting.

After a detailed review of the record in the *Hernandez* case, the Court concludes that a reasonable jury could find that the sting of New York Life's remarks was substantially

greater than the sting of the evidence presented in the *Hernandez* case. More specifically, a jury could reasonably find that the overwhelming majority of evidence in the *Hernandez* trial which directly implicated Dawson in any misconduct related to his involvement in unauthorized commission switching, and that the evidence suggesting that he knew of, participated in, or encouraged the forgery or fraud was minimal, at best. Indeed, this Court's review of the record from the *Hernandez* case reveals a virtual absence of evidence connecting Dawson directly to the *Hernandez* fraud and forgery.

Oscar Herrera's testimony was that Dale Gillum (and later Richard Miller) knew that he had committed the Hernandez forgery and fraud, not Dawson; and, a jury could readily conclude that the other evidence relied on by New York Life as evidence of Dawson's involvement in the Hernandez fraud and forgery falls far short of indicating any such involvement.[28] It is also worth noting here that Herrera's testimony that Gillum was aware of the Hernandez fraud and forgery cannot reasonably be understood as attributing such knowledge to all of "local management." Herrera expressly testified that Richard Miller, the Corpus Christi Office Manager, was unaware of the Hernandez fraud when it was perpetrated by Herrera and that Miller did not learn about the fraud until Herrera told him several days later. Dawson's knowledge (or lack thereof) of the Hernandez fraud and forgery is particularly significant in view of the fact that Kane, Paul and Gammill were purporting to discuss or explain the *Hernandez* case and the punitive damage award against New York Life in that case. And, of course, the jury instructions in that case were specifically framed in terms of the Hernandezes' injuries.

The closest New York Life comes to offering evidence from the *Hernandez* trial supporting the proposition that Dawson knowingly participated in, condoned or authorized fraud or forgery lies in the testimony of Roland Garza and Sonny Correa. As re-counted above, Garza testified that he was *of the opinion* that Dawson *must have known* about unauthorized term conversions in the Corpus Christi General Office. Record at 695. Significantly, Garza did not purport to testify as to any occasions on which Dawson actually knew of, condoned or otherwise participated in any unauthorized conversions; he merely opined that Dawson and other management personnel must have known of such unauthorized conversions. That Garza's testimony was speculative was apparent to New York Life's trial counsel—they objected to the testimony on that ground, although the objection was overruled. Similarly, in light of the speculative nature of Garza's testimony, a jury in the present action could reasonably conclude that Garza's testimony carried little, if any, sting. Furthermore, the Garza testimony only speaks to Dawson's alleged knowledge of unauthorized term conversions, not his participation in or encouragement of such conduct. It must remain for the jury to determine whether Garza's testimony carried the same sting as New York Life's challenged statements.

Former New York Life agent Sonny Correa testified that his Sales Manager, Mario Olivarez, not Dawson, had asked him to forge policyholder's signatures. Record at 1966. And, Correa testified that it was Olivarez, not Dawson, who told him that if the policyholder found out they could just reverse the policy. *Id.* at 1970–71. Correa's testimony suggesting Dawson's knowledge or encouragement of forgery is found in three passages. In the first, Correa testified as follows:

Q. I also understand you to testify here that on two occasions you say you were asked to forge someone's name including your dad's name.

A. Relatives of mine, yes, sir.

Q. And that was Mario Olivarez who asked you to do that?

A. Yes, sir.

28. This is not to say that there was no evidence indicating that Dawson was aware of Herrera's efforts to sell a policy to the Hernandezes. There was. However, this evidence falls far short of indicating awareness of, participation in, or encouragement of the fraud or forgery connected with that policy.

Q. Mr. Dawson didn't ask you to do that; did he?

A. No. Mario said Dawson asked him to talk to me about converting policies.

Record at 1988. In the second, when asked if he was ever asked to convert policies by Ron Dawson, Correa answered, "Not directly, no sir. But through Mario Olivarez my manager." *Id.* at 1966. And, in the third, Correa testified that when he would say no to requests by management to forge signatures, he "would get called into Mr. Dawson's office and he would try to set me straight." *Id.* at 1979. There was no explanation of what that meant; however, Correa's testimony in the first two passages is quite explicit that Dawson never asked him to forge policies. So, whatever Correa might have meant when he said that Dawson would try to "set him straight," his testimony leaves little room for the inference that Dawson asked him to convert policies without authorization by forging applications. Whatever sting is to be found in Correa's testimony lies in his statements, "Mario said Dawson asked him to talk to me about converting policies" and "Not directly, no sir. But through Mario Olivarez my manager." It is apparent from this testimony that Correa had no personal knowledge of any statements or conduct by Dawson reflecting Dawson's encouragement or knowledge of fraud and forgery. Like Garza's testimony, Correa's testimony is far from conclusive evidence that Dawson knew of, encouraged, or participated in conversion application forgery. And, again, we believe that it is for the jury to determine whether Correa's speculative testimony carries the sting of New York Life's challenged statements.

In addition to the above testimony, we have carefully considered all of the remaining *Hernandez* evidence to which New York Life now points as evidence of Dawson's knowledge or encouragement of, or participation in, fraud and forgery (*e.g.*, Dawson's failure to terminate Herrera despite being aware of danger signals; Dawson's reference to "pulling a rabbit out of the hat"; Dawson's warning to another agent that the Hernandezes were "Oscar's [Herrera's] catch"; the internal audit report; the monthly plan notes; *see*

*generally* Defs.' Reply at 15–16) and we will not labor over every individual piece. Our review of the evidence leaves us with the firm conclusion that a jury could reasonably determine that the "gist or sting" of this evidence, even viewed in its totality, is not as great as those remarks by New York Life's officers that attribute to Dawson knowledge of, or participation in, acts of fraud and forgery. While there was, without question, substantial evidence that certain managers at the Corpus Christi General Office knew of, participated in, and encouraged such misconduct, a jury could reasonably find that the *Hernandez* evidence linking Dawson himself to fraud and forgery is so tenuous and insubstantial as to be incapable of supporting the inference that he personally knew of, participated in, or authorized such acts. Thus, a jury could conclude that the actual sting of the *Hernandez* evidence was far less than the sting of New York Life's statements which, by failing to distinguish between individual managers, had the effect of attributing knowledge, encouragement, and participation in fraud and forgery to Dawson.

For the foregoing reasons, to the extent that defendants base their summary judgment motion on the fair report privilege, the motion must be denied, and the issue of whether the statements constituted a "fair" abridgment of the *Hernandez* proceedings must be submitted to the jury. *See Tunney v. American Broadcasting Co.,* 109 Ill.App.3d at 776, 65 Ill.Dec. at 299, 441 N.E.2d at 91 (finding that a genuine issue of material fact existed as to the accuracy of a news report where the report attributed sinking driveways and leaking roofs to the plaintiff's poor workmanship but the record established only that building inspectors had made general references to plaintiff's "shoddy" work and had not specifically determined that the sinking driveways and leaking roofs were a result of plaintiff's poor construction).

*Counts I–III: The Form U–5 Statements*

Counts I–III of Dawson's Amended and Supplemental Complaint allege defamation claims based on the original and amended Form U–5s submitted to the NASD by NYL-SEC. Article IV, § 3(a) of the NASD By-Laws requires a NASD member to file a

form giving written notice to the NASD of the "termination of the association with a member of a person who is registered with it." Section 3(b) requires the member to amend the notice "in the event that the member learns of facts or circumstances causing any information set forth in said notice to become inaccurate or incomplete." Item 13B(1) of the Form U–5 inquires as to whether the individual was "the subject of an investment-related consumer-initiated complaint [29] that alleged compensatory damages of $10,000 or more, fraud, or the wrongful taking of property." Dawson's claims are based on defendants' responses to the Item 13B(1) inquiry. Defendants maintain that all of the challenged Form U–5 statements are conditionally or absolutely privileged. Dawson disputes that any absolute privilege applies. He concedes that NYLSEC's statements on the Form U–5s are conditionally privileged, but he maintains that a genuine issue of material fact exists as to whether NYLSEC abused its conditional privilege. Specifically, Dawson maintains that defendants abused the conditional privilege by inaccurately reporting allegations against him and by failing to investigate the truth of the amended U–5 statements.

A. *Duty to Investigate Charges Prior to Filing a Form U–5*

Before turning to the privilege issue, we first consider whether a NASD member has a duty to investigate the truth of allegations against a registered representative associated with the member before filing a Form U–5. This issue overlaps somewhat with the privilege analysis and it will be helpful to address it at the outset.

Both parties have submitted the affidavits of experts addressing the duties of NASD members with respect to the completion of a Form U–5. Dawson's expert, Marc B. Horin,[30] attests that under the NASD By–Laws

and Rules of Fair practice members have a duty to investigate allegations made against former or current employees, and only through such investigation can the member fulfill its obligation of accurate and complete reporting on a Form U–5. Horin Aff. ¶ 13. Mr. Horin also attests that "[a] firm is not required to report allegations against an employee when the firm knows that the allegations are false, and in practice, when such an obviously false allegation is received, firms typically do not file a Form U–5 to report it. If the firm does report the allegation, however, it has an obligation under the rules requiring accuracy, completeness and fair dealing to report that it suspects or knows the allegation to be false and unfounded." *Id.* ¶ 15.

In turn, defendants submit the affidavit of Craig L. Landauer, currently Associate General Counsel of the NASD. Mr. Landauer attests that question 13(B) of the Form U–5 (which asks whether the individual was the subject of an investment-related consumer-initiated complaint) requires an affirmative response if the registered representative was the subject of a consumer-initiated complaint that alleged compensatory damages of $10,000 or more, fraud, or the wrongful taking of property. Landauer Aff. ¶ 5. Mr. Landauer notes that "[t]he customer complaint could take the form of a letter, an arbitration proceeding or a civil complaint that named the registered representative in the body or in the caption." *Id.* n. 1. Additionally, Mr. Landauer states that "member firms are required to report ... whether the complaints are substantiated or not.... Member firms have no discretion in this regard and must report complaints even if the member firm believes or suspects the allegations contained therein are false." *Id.* ¶ 6.

The scope of obligations imposed by a regulatory statute or agency rule is a ques-

---

29. [This Court's footnote.] Article III, § 21(e) of the NASD Rules of Fair Practice defines "complaint" as "any written statement of a customer or any person acting on behalf of a customer alleging a grievance involving the activities of those persons under the control of the member in connection with the solicitation or execution of any transaction or the disposition of securities or funds of that customer."

30. Mr. Horin served for approximately five years during the 1980s as a senior compliance examiner with the NASD. Presently, among other things, Horin advises clients on a daily basis about compliance matters including the proper preparation and filing of Forms U–5. Horin Aff. ¶¶ 3, 4.

tion of law, not of fact. Thus, it would be improper to submit this issue to a jury. *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 900 (7th Cir.1994) ("The meaning of federal regulations is not a question of fact to be resolved by the jury after a battle of experts. It is a question of law to be resolved by the court.") Accordingly, to the limited extent that it is necessary to resolve this issue,[31] we shall address it.

The NASD By–Laws and Rules of Fair Practice are essentially silent as to a member's duty *vel non* to investigate the truth of allegations made against a registered representative associated with the member prior to submitting a Form U–5. Article IV, § 3(a) of the NASD By–Laws simply requires that a NASD member provide written notice of a registered person's termination within 30 days after such termination. The member must also provide a copy of the notice to the terminated individual. Section 3(b) imposes the additional duty to amend the notice within 30 days of learning of "facts or circumstances causing any information set forth in said notice to become inaccurate or incomplete." The NASD Rules of Fair Practice provide: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." NASD RULES OF FAIR PRACTICE, Art. III, § 1.

A 1988 "Notice to Members" issued by the NASD explains the members' duties as follows:

> Member firms are ... required to file complete and accurate information on any Uniform Termination Notice for Securities Industry Registration ("Form U–5") that is required to be filed with the NASD. Article IV, Section 3 of the By–Laws requires that a member firm file Form U–5 promptly, but not later than 30 calendar days after terminating a registered person. Items 13–15 on Form U–5 ask for information concerning apparent misconduct by a person while associated with the firm submitting the Form U–5. A "yes" answer to Items 13–15 must be accompanied by a detailed explanation of the apparent misconduct. Failure to provide accurate answers to Items 13–15 may deprive the NASD of its ability to detect violations and subsequently sanction persons for violations of the NASD's rules and other applicable federal statutes and regulations. Failure to provide this information may also subject members of the investing public to repeated misconduct and may deprive member firms of the ability to make informed hiring decisions.
>
> The NASD would also point out that members and their associated persons may be subject to administrative, civil, and even criminal penalties for failing to provide complete and accurate information on Forms U–4 and U–5.

NASD Notice to Members 88–67. Another NASD Notice to Members was issued the following year in connection with SEC approval of amendments to Article IV, Section 3, that, among other things, would require members to provide a copy of the Form U–5 to the terminated employee. The 1989 Notice to Members provides, in pertinent part:

> The amendment ... will require that a member submitting ... a ... Form U–5 ... should also provide a copy to the employee.... As in the past, the member is required to exercise good faith and to disclose the circumstances of the termination in a manner reasonably designed to inform the NASD and future employers of these circumstances. The NASD believes that the policy of providing broader access to the information on the Form U–5 requires that terminated persons be given the Form U–5 so they can verify the accuracy and completeness of the representations in the form. The terminated individual then can express any disagreement with the Form U–5 to his or her subsequent NASD member employer.

NASD Notice to Members 89–57.

 After a careful review of the NASD By–Laws and Rules of Fair Practice, as well

---

**31.** Resolving this issue is necessary for purposes of determining whether or not defendants actually had to file the amended Forms U–5 and the scope of their reporting obligations. However, we note that even if the NASD By–Laws and Rules impose no duty to investigate, it is possible that common law principles relating to abuse of privilege may require some investigation.

as the NASD Notices to Members, this Court cannot conclude that those sources impose on members a "duty to investigate" the validity of allegations contained in a customer complaint prior to completing the pertinent sections of the Form U–5 or amendments thereto. We find that the NASD By–Laws and Rules require no more than that the member's report be "accurate and complete."

In the first place neither the By–Laws, nor the Rules, nor the Notices contain any indication that an investigation into the merits or bona fides of a complaint is required of a member firm. Rather, the only obligation that emerges from the language of the pertinent NASD documents is that Form U–5 disclosures be accurate and complete.

We further note that one of the apparent objectives of the NASD disclosure requirements—namely, enabling the NASD to detect violations and sanction wrongdoers—would not be furthered (and may be hindered) by having a member firm conduct an investigation into the merits of a complaint and subjectively determine, on its own, whether the complaint is sufficiently valid to require reporting. It is quite conceivable that a member firm might be motivated to downplay complaints against individuals associated with the firm and seek to minimize the number of complaints against its agents that are reported to the NASD. Allowing a member to unilaterally decide that a complaint need not be reported—based on its determination that the complaint was without merit—could surely thwart the NASD's objectives.

▮ While a prefiling investigation may not be required, the member is nevertheless obliged to provide "complete and accurate" information. This Court finds that these twin obligations require in the first instance that reports of customer complaints provide accurate descriptions of the alleged conduct. Additionally, the completeness prong requires that all relevant information available to the member be provided—whether it be incriminating or exculpatory. Thus, we conclude that if the member is aware of any facts that would cast doubt on the truth of the allegations of the complaint, they should be reported as part of the "detailed explanation of the apparent misconduct."

## B. *Privileges*

▮ We begin our discussion of privileges by rejecting defendants' suggestion that the Form U–5 statements should be accorded absolute immunity. Defendants contend that NASD rules (which have the force of law) require that an NASD member who receives a customer complaint alleging damages of $10,000 or more must file a Form U–5 (or amended Form U–5 as the case may be) describing the allegations. Accordingly, defendants invoke § 592A of the Second Restatement for the proposition that they are absolutely privileged to publish the allegations of a customer complaint on an amended Form U–5.

Section 592A provides, "One who is required by law to publish defamatory matter is absolutely privileged to publish it." RE-STATEMENT (SECOND) OF TORTS § 592A. Although § 592A supports defendants' position, we note that § 595 includes among those occasions giving rise to a conditional privilege circumstances in which "the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter." *Id.* § 595(1)(b). The comments to this section note: "In the case of a private citizen [as opposed to a public official], the privilege arising from the legal duty is always conditional." *Id.* cmt. f. We further note that the comment to § 592A observes that "[t]he chief present application of the Section is in the case of radio and television broadcasting stations, which are required by the Federal Communications Act to afford to political candidates equal opportunity to be heard, without any power of censorship over the matter broadcast." RESTATEMENT (SECOND) OF TORTS § 592A cmt. a. Although comment b to § 592A is quick to add that the rule stated in § 592A is not limited to the case of broadcasting stations, *id.* cmt. b, it is instructive to note that in *Kuwik*, the Illinois Supreme Court considered a letter sent by an insurer to an insured explaining the reason for the denial of benefits to have been "sent because of a legal duty" and treated the communication as conditionally—not abso-

lutely—privileged pursuant to § 595(1)(b). 156 Ill.2d at 29–30, 188 Ill.Dec. at 771, 619 N.E.2d at 135. Accordingly, this Court rejects defendants' argument that its amended Form U–5 statements reporting allegations against Dawson are absolutely privileged under the authority of § 592A.[32] Instead, following the Illinois Supreme Court's approach in *Kuwik*, we find the statements to be conditionally privileged.

We further note that we are bound by the Seventh Circuit's recent opinion in *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704 (7th Cir.1994), in which the court—applying Illinois law—clearly rejected an invitation to extend the absolute immunity that attaches to statements made in a quasi-judicial proceeding, to employers' Form U–5 statements. *Id.* at 708. In view of the Seventh Circuit's clear rejection of defendants' position and the absence of any authority from the Illinois Supreme Court to the contrary, we must follow *Baravati* and find that NYLSEC's Form U–5 statements are not absolutely privileged, but rather are entitled only to a conditional privilege which may be forfeited if abused. As noted in *Baravati*, the conditional privilege may be forfeited if the defendant "knows or is reckless in failing to discover that it is defaming [the plaintiff] falsely." *Id.*

■ In addition to asserting the qualified privilege recognized in *Baravati* for Form U–5 statements, defendants also argue that their Form U–5 statements are protected by the privilege for fair reports of judicial proceedings. With respect to the third amended Form U–5, which reported the allegations of the civil lawsuit filed by Oscar Herrera's parents, we have little doubt that the fair report privilege applies. As explained in *Berkos v. National Broadcasting Co.*, 161 Ill.App.3d 476, 491, 113 Ill.Dec. 683, 692, 515 N.E.2d 668, 677 (1st Dist.1987), "under the privilege, a news entity can restate defamatory statements made about the plaintiff by another person in the context of public rec-

ords or proceedings." There can be no dispute that the civil complaint filed by the Herrera's in Texas court is a matter of public record. Therefore, we find that defendants' statements on Dawson's third amended Form U–5 are protected under the fair report privilege.

■ Defendants maintain that the fair report privilege extends to matters necessarily preliminary to the judicial proceedings and hence should extend to the first and second amended Forms U–5, which reported the allegations contained in the Cruz demand letter. Section 17.505(a) of the Texas Business and Commerce code requires that as a prerequisite to filing a deceptive trade practice suit, a consumer must give written notice to the defendant advising the defendant in reasonable detail of the specific complaint and the damages incurred. Texas Bus. & Comm.Code Ann. § 17.505(a). The purpose of the notice requirement is "to afford the opportunity for presuit negotiations and settlement." *Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.*, 836 S.W.2d 726, 736 (Tex.Ct.App.1992). Defendants have not suggested, nor has this Court found, that the demand letter required by § 17.505(a) ever becomes a part of the public record. More importantly, although the letter is in a literal sense a "matter necessarily preliminary to a judicial proceeding," we find no authority for bringing the contents of a private demand letter within the scope of the fair report privilege.

The authority upon which defendants rely does not support their position. In *Parrillo, Weiss & Moss v. Cashion*, 181 Ill.App.3d 920, 130 Ill.Dec. 522, 537 N.E.2d 851 (1st Dist. 1989), the court held that statements contained in a letter sent to the Department of Insurance requesting an investigation into the claims practices of an insurer were absolutely privileged because they were made in the context of a quasi-judicial proceeding. *Id.*, 181 Ill.App.3d at 928, 130 Ill.Dec. at 527,

---

**32.** The Court is mindful that in *Weber v. Cueto*, 209 Ill.App.3d 936, 942–44, 154 Ill.Dec. 513, 517, 568 N.E.2d 513, 517 (5th Dist.), *appeal denied*, 139 Ill.2d 605, 159 Ill.Dec. 118, 575 N.E.2d 925 (1991), an Illinois appellate court applied an absolute privilege to a communication

required by the Illinois Rules of Professional Conduct. In view of the Illinois Supreme Court's treatment of a statement required by law in *Kuwik*, however, we respectfully decline to follow *Weber* on this point.

537 N.E.2d at 856. In so holding the court stated:

> We are ... of the opinion that the defendant's letter to the Department of Insurance was a preliminary step to a quasi-judicial proceeding and, as such, was absolutely privileged. The absolute privilege embraces actions required or permitted by law in the course of judicial or quasi-judicial proceedings as well as actions "necessarily preliminary" to judicial or quasi-judicial proceedings.

*Id.* Thus, *Parrillo* stands for the proposition that statements made in the course of actions necessarily preliminary to a judicial proceeding are absolutely qualified, *not* that all steps preceding the actual commencement of a judicial or other public proceeding fall within the scope of the privilege for fair reporting of judicial proceedings. Accordingly, we conclude that defendants' statements on the first and second amended Forms U–5 are not entitled to the fair report privilege.[33]

■■■ Finally, we consider one last privilege issue. In support of their summary judgment motion, defendants invoke § 602 of the Restatement (Second) of Torts, which states:

> One who upon an occasion giving rise to a conditional privilege publishes a defamatory rumor or suspicion concerning another does not abuse the privilege, even if he knows or believes the rumor or suspicion to be false, if
>
> (a) he states the defamatory matter as rumor or suspicion and not as fact, and
>
> (b) the relation of the parties, the importance of the interests affected and

the harm likely to be done make the publication reasonable.

RESTATEMENT (SECOND) OF TORTS § 602. Although there is no Illinois authority adopting, or even citing, this provision of the Restatement (Second), we believe, in view of the Illinois Supreme Court's adoption of the Restatement (Second)'s qualified privilege framework in *Kuwik,* that the Illinois Supreme Court would give effect to this provision of the Restatement (Second).[34] Accordingly, this Court finds that § 602 applies to defendants' Form U–5 statements. However, it is important to be clear about the import of § 602. Section 602 does not create absolute privilege for reports of rumor or suspicion; rather, it merely narrows the scope of conduct that may be found to constitute an abuse of qualified privilege.

C. *The Form U–5 Claims and Applicability of Privilege*

With the foregoing exposition of the governing standards and operative principles in mind, we may now turn to the merits of Dawson's Form U–5 claims.

■■■ In the first place, it is quite clear that defendants are entitled to summary judgment as to Count III, which is based on the third amended Form U–5. No reasonable jury could conclude that defendants abused the fair report privilege in reporting the contents of the Herrera civil complaint on the third amended Form U–5. Defendants did nothing more than quote the allegations of the complaint that referred to Dawson. Thus, the report is plainly fair and accurate. Similarly, under § 602, the Court notes that the Herrera's allegations are

---

**33.** Even if the privilege did apply to reporting the contents of a private demand letter, the privilege is improperly invoked here. Defendants' challenged statements as to the allegations against Dawson constitute inferences drawn from the demand letters not a narrow reporting of the actual charges made therein. As our earlier discussion of the fair report privilege reflects, the privilege does not extend to such inferences. *See supra* at 1532–1533.

**34.** Dawson erroneously asserts that the Seventh Circuit "squarely rejected" the applicability of § 602 in *Baravati. See* Pl.'s Mem. at 46. This section is not mentioned in the *Baravati* opinion.

The defamation claims in *Baravati,* unlike the present case, did not involve statements made in response to item 13(b), wherein the employer is asked to report the allegations made against the registered individual. Rather, the claims in *Baravati* were based on the employer's stated reason for terminating the plaintiff; and those statements did not entail reporting rumor or suspicion about the employee. In contrast, where the employer is asked to report the "allegations" contained in a customer complaint, the employer is forced precisely to report rumor or suspicion about the registered individual. Thus, the issue we now confront was not presented in *Baravati.*

clearly identified as allegations, and thus it makes little difference whether defendants believed the allegations were true or not. In any event, Dawson has adduced no evidence that would support the conclusion that defendants knew or believed that the allegations were false. For all of these reasons, summary judgment in favor of defendants must be granted as to Count III.

■■■ The situation is quite different with respect to the first and second amended Forms U–5, which purported to report the allegations of the Cruz demand letter. The first and second amended Form U–5 described the allegations against Dawson as follows:

> Allegedly condoned forgery of customer's name to pay $300 premium needed to convert term insurance policy to whole life and condoned other alleged forgeries. Allegedly informed persons who committed the forgery in the Cruz matter that if detected they would not be reported to proper authorities.

Defs.' Facts ¶ 69. However, the Cruz demand letter does not expressly allege that Dawson condoned the forgery of Cruz's signature. Indeed, the pertinent language from the demand letter expressly identified Dale Gillum as the manager who told Herrera to forge the signature:

> As you may be aware, testimony in the *Lamar Hernandez v. New York Life* case, directly implicates New York Life and its management in the fraud perpetrated on the Cruz family. The evidence shows that Associate General Manager Dale Gillum

told agent Herrera to forge the application in the conversion forms.

Pl.'s Appendix at T408. Thus, a jury could reasonably find recklessness in defendants' characterization of the Cruz allegations as directly implicating Dawson in the Cruz forgery.

Similarly, there is another respect in which the amended Form U–5 recasts the actual language of the demand letter with the effect of directly implicating Dawson in the Cruz forgery: While the demand letter states, "Moreover, the evidence showed that General Manager Ron Dawson condoned forgery for conversion, informing his agents that 'if they were caught, they could simply reverse the conversions and reimburse the insureds,'" the amended Form U–5 rephrases this statement with specific reference to the Cruz forgery as, "Allegedly informed persons who committed the forgery in the Cruz matter that if detected they would not be reported to proper authorities." A jury could reasonably find that defendants acted recklessly in going beyond the allegations of the demand letter and recasting the language so as to implicate Dawson more directly in the Cruz matter.[35]

What sets the first and second amended Forms U–5 apart from the third amended Form U–5, and renders the former actionable, is that a jury could reasonably find that defendants did not faithfully report the allegations contained in the Cruz demand letter. Instead, defendants embellished the Cruzes' allegations putting a gloss on them that a jury could reasonably find to be more damaging than the letter's actual allegations.[36]

---

**35.** It should also be noted that the same day that New York Life received the Cruz demand letter, it received a demand letter from the same attorney regarding another policyholder complaint—the Herring demand letter. The Herring demand letter contained materially identical language to that of the Cruz letter. However, it is apparent from the Herring letter that Oscar Herrera's fraud and forgery involving the Herrings occurred *after* Dawson left the Corpus Christi Office. Thus, despite the fact that the same language concerning Dawson as was used in the Cruz letter is used in the Herring demand letter, it is plain that attorney Herrera was not intending to directly implicate Dawson in the Herring matter—Dawson was gone. A jury could similarly find that attorney Herrera was not attempting to directly implicate Dawson in

the Cruz matter but instead was simply waving unfavorable evidence from the *Hernandez* case before the eyes of New York Life in order to raise the specter of another sizeable punitive damage award. The point for present purposes is that a jury could find that New York Life recklessly went beyond reporting the actual allegations of the Cruz letter by suggesting that Dawson was alleged to have been directly involved in the Cruz fraud.

**36.** This is critical, of course, because if the jury finds that the defendants' characterization of the Cruz allegations added no "incremental harm" to Dawson's reputation above and beyond that which would have been caused by a faithful reporting of the allegations, Dawson's defama-

While § 602 of the Restatement (Second) permits one to report allegations without liability even knowing them to be false, this does not give carte blanche to report fabricated or exaggerated allegations.[37]

We also believe that the jury should be entitled to consider the evidence that defendants did not complete Form U–5s for Dale Gillum or Terry Richards despite the fact that the Cruz and Herring demand letters specifically identified these individuals as having knowledge of forgery: "The evidence shows that … Dale Gillum told agent Herrera to forge the application" and "Terry Richards, although fully aware of the forgery of the Cruz policy and other policies forged by agent Herrera, … failed to properly report agent Herrera to the State Board of Insurance." Defendants' failure to complete U–5s regarding these two individuals bolsters Dawson's argument that their conduct towards him was motivated by malice and a specific desire to harm him. Defendants' suggestion that they had no knowledge that the demand letters contained allegations against these two individuals is plainly a proposition for the jury to consider.

If the jury concludes that defendants reported these purported allegations, knowing or with reckless disregard of the truth that the Cruzes were not actually making any such allegations against Dawson, the jury could conclude that defendants abused their qualified privilege. We believe that this is an issue that must be left for the jury. Accordingly, defendants' motion for summary judgment as to Counts I and II is denied.

## II. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

■ In Count VI, Dawson alleges that defendants intentionally interfered with his prospective economic advantage by making defamatory statements at the 1993 Managers' Meeting, in the training videotape, and in the Forms U–5.[38] To prevail on his tortious interference claim, Dawson must prove the following: (1) he had a reasonable expectation of entering into a valid business relationship; (2) defendants knew of his expectancy; (3) defendants purposefully interfered to defeat Dawson's expectancy, preventing it from ripening into a valid business relationship; and (4) Dawson suffered damages as a result of the interference. *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, ——, 217 Ill.Dec. 720, 723, 667 N.E.2d 1296, 1299 (1996); *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170–71 (7th Cir.1993) (citing *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 657, 568 N.E.2d 870, 878 (1991)).

■ Defendants raise three arguments as to why they are entitled to summary judgment on Dawson's tortious interference claim. First, defendants assert that the same privileges protecting them from defamation liability protect them from liability for tortious interference. Second, defendants assert that Dawson has failed to show that he had any reasonable expectation of entering into a valid business relationship or that defendants knew of that expectation. Third, defendants assert that tortious interference requires action directed toward a third party that causes that party not to enter into a relationship with the plaintiff, and that their allegedly defamatory statements were not directed toward such a third party.

To the extent that we have already found genuine issues of material fact as to the abuse of privilege issue, defendants are not entitled to summary judgment on Dawson's tortious interference claims based on privi-

---

tion claim will fail under the doctrine of "substantial truth." *See Desnick v. American Broadcasting Cos.*, 44 F.3d 1345, 1350 (7th Cir.1995).

**37.** Indeed, it is ironic that a strong argument can be made that Attorney Herrera's demand letters, which by their very nature are advocacy devices, contain a more accurate recitation of the *Hernandez* trial evidence than the defendants' first and second amended Forms U–5.

**38.** In his complaint, Dawson alleges that he "had a valid expectancy of entering into a lucrative employment relationship with competitors of New York Life in the insurance business." Supplemental & Am.Compl. ¶ 87. He further alleges that his expectancy was reasonable based on his past success in the field, his excellent reputation within the profession, and the significant demand for experienced and successful managers like himself. *Id.*

lege.[39] So, we turn directly to defendants' second argument—namely, that Dawson has not presented sufficient evidence of a reasonable expectation of entering into a valid business relationship of which defendants were aware and with which they purposely sought to interfere. The Illinois Supreme Court recently examined this element in *Anderson v. Vanden Dorpel,* 172 Ill.2d 399, 406, 217 Ill.Dec. 720, 723, 667 N.E.2d 1296, 1299 (1996). Because we find that case to be dispositive of Dawson's tortious interference claims, we shall recite the facts and reasoning of that case in some detail.

The plaintiff in *Anderson* had worked for nine years as director of corporate relations at Northwestern University when she was approached by someone from the YMCA who wanted to recruit her for a comparable position at the YMCA. Anderson interviewed with the YMCA's director of personnel and senior vice president on November 20, 1989. Further interviews were then scheduled for early December so that Anderson could interview with other members of the board of trustees. Anderson was told her initial interviews had gone well and that she was being seriously considered for the position. Indeed, Anderson alleged that she was the leading candidate for the position. On December 6, 1989, she interviewed with the YMCA's director and was assured that the interview had gone well. Anderson learned that she was going to be recommended for hiring by persons who interviewed her after she completed a follow-up interview a few days later.

Sometime before that follow-up, the YMCA's director called Northwestern and spoke to Anderson's supervisor, who stated that Anderson "did not follow up on assignments" and "could not get along with her coworkers." Shortly thereafter, someone from the YMCA called Anderson and cancelled her scheduled follow-up interviews. Anderson filed suit claiming defamation and tortious interference with prospective economic advantage. *Anderson,* 172 Ill.2d at 402–04, 217 Ill.Dec. at 720–22, 667 N.E.2d at 1297–99. We discuss the Illinois courts' treatment of the tortious interference claim only.

The trial court dismissed Anderson's tortious interference claim and the Illinois appellate court reversed, finding that Anderson had a reasonable expectancy of being hired by the YMCA. *Id.* at 404, 217 Ill.Dec. at 722, 667 N.E.2d at 1298. The Illinois Supreme Court reversed, stating:

> Without determining here whether in all cases a job applicant must have had a firm offer in hand to state a cause of action for intentional interference with prospective economic advantage, we believe that the facts alleged in the present case fall short of what is necessary to state a claim under that theory. The allegations ... demonstrate nothing more than that the plaintiff was a candidate for a position with the YMCA and that she was scheduled for further interviews at a time when her candidacy came to an end. The hope of receiving a job offer is not a sufficient expectancy.

*Id.* at 406, 217 Ill.Dec. at 723, 667 N.E.2d at 1299.

It is significant to note that the Illinois Supreme Court specifically found that the plaintiff's allegations that she was "the leading candidate" for the position, that she had been assured that her interviews had gone well and that she was being "seriously considered," and that she was told that she was going to be recommended for hiring, were unavailing to save her claim because even these allegations were not sufficient to demonstrate a reasonable expectancy of employment. *Id.* at 408–09, 217 Ill.Dec. at 724, 667 N.E.2d at 1300. The court also noted the lack of any corroborative detail in the allegations such as the identity of the persons who made these assurances to the plaintiff. After noting that plaintiffs who stood in far more favorable positions than Ms. Anderson have been found by Illinois courts not to have a

---

**39.** Except, since we have found that no genuine issue exists as to abuse of privilege in connection with defendants' statements on the third amended Form U–5, Dawson cannot base his tortious interference claim on those statements and partial summary judgment must be granted as to that aspect of Dawson's claim.

sufficiently reasonable expectancy of prospective employment, *id.* at 408–09, 217 Ill. Dec. at 724, 667 N.E.2d at 1300 (citing *Werblood v. Columbia College*, 180 Ill.App.3d 967, 129 Ill.Dec. 700, 536 N.E.2d 750 (1989) (finding the expectation of renewal of an existing contract to be insufficient even though college officials assured her that her employment there was secure)), the court concluded:

> To hold that plaintiff's complaint states a cause of action for intentional interference with prospective economic advantage would considerably broaden the scope of the tort. Under the plaintiff's reasoning, the potential class of litigants could include all persons who interview for a particular job, and anyone supplying a negative reference to a prospective employer might conceivably find himself or herself subject to an action for intentional interference with prospective economic advantage. We do not believe that such an expansion of the cause of action is warranted.

*Id.* at 411, 217 Ill.Dec. at 725, 667 N.E.2d at 1301.

We do not believe that the evidence presented by Dawson in opposition to the motion for summary judgment can withstand the force of *Anderson.* As evidence to support his tortious interference claim, Dawson relies on the following: (1) after his termination from New York Life, he discussed prospective employment with more than 12 top-rated insurance companies; (2) two companies, Minnesota Mutual and John Hancock Company inquired about Dawson; (3) New York Life knew of Dawson's prospective arrangement with Pruco Securities in July 1994; and (4) Dawson asserts that "The information on my Forms U–5 presented a significant barrier to my employment." Dawson Aff. ¶ 8.

We begin by noting that Dawson's testimony that he discussed prospective employment with 12 companies is wholly insufficient evidence to support the existence of a reasonable expectancy of employment. In the first place, the "reasonable expectation" element of a tortious interference claim requires identification of specific third parties with whom the plaintiff had a business expectancy. *Celex Group, Inc. v. Executive Gallery*, 877 F.Supp. 1114, 1124–26 & n. 19 (N.D.Ill.1995) (citing cases). More importantly, there is not a shred of evidence that any of these 12 companies was anywhere near offering Dawson a position. Even the evidence submitted by Dawson concerning Minnesota Mutual and John Hancock shows nothing more than that Dawson was a potential job candidate and that inquiries were made about him. There is simply no evidence in the record that would support the inference that Dawson had a reasonable expectancy of employment with these two companies, let alone that New York Life was aware of the expectancy.[40] Accordingly, to the extent that

---

**40.** There is also no evidence that these inquiries were made to New York Life before the 1993 Managers' Meeting was held. Therefore, Dawson could not support the claim that the statements made at the Managers' Meeting were made to purposely interfere with his reasonable expectations of employment—as far as the record reveals, defendants had no knowledge of any reasonable expectancy at the time of the Managers' Meeting, even if one could be found to exist. Furthermore, with respect to both the Managers' Meeting statements and the compliance training videotape there is another fatal deficiency in Dawson's showing: Tortious interference requires conduct directed at the third party with whom the plaintiff entertains a business expectancy. In *Parkway Bank & Trust Co. v. City of Darien*, 43 Ill.App.3d 400, 403, 2 Ill.Dec. 234, 238, 357 N.E.2d 211, 215 (2d Dist.1976), the Illinois appellate court dismissed a tortious interference claim, noting, among other reasons that, "none of the particular acts stated allege that the defendants purposely caused a third person not to enter into or continue with prospective contractual relationship." Other Illinois appellate courts, as well as federal courts applying Illinois law, have followed *Parkway*'s holding and have required conduct directed toward a third party that results in the expectancy not coming to fruition. *See, e.g., Willcutts v. Galesburg Clinic Assoc.*, 201 Ill.App.3d 847, 147 Ill.Dec. 853, 560 N.E.2d 1 (3d Dist.1990); *Galinski v. Kessler*, 134 Ill.App.3d 602, 89 Ill.Dec. 433, 480 N.E.2d 1176 (1st Dist.1985); *Israeli Aircraft Indus., Ltd. v. Sanwa Business Credit Corp.*, 850 F.Supp. 686, 692–93 (N.D.Ill.1993) ("The tort requires an allegation of conduct directed by the defendant toward a third party through which the defendant purposely causes the third party not to enter into or continue with a prospective contractual relationship with the plaintiff.") (internal quotation marks and citation omitted), *aff'd*, 16 F.3d 198 (7th Cir.1994). Because the allegedly defamatory statements made at the 1993 Managers' Meeting and contained in the compliance training videotape were not directed toward any third party with whom Dawson claims to have had a business expectancy (nor is there any indication that these statements were somehow communicated to prospective employers) they cannot sup-

Dawson's tortious interference claim relates to an expectancy to enter into a relationship with either of these two companies, defendants' motion is granted.

■■■ The only remaining basis for Dawson's tortious interference claim relates to Dawson's inability to broker securities for Pruco Securities. Defendants do not dispute that they were aware of Dawson's prospective arrangement with Pruco Securities in July 1994, see Defs.' Resp. Add'l Facts ¶ 125. Thus, we now consider defendants' third argument—namely, that the first and second amended Forms U–5 were not directed toward Pruco. As we have already discussed, tortious interference requires conduct directed at the third party with whom the plaintiff entertains a business expectancy. See supra note 40. Defendants argue that the Forms U–5 were not directed toward anyone with whom Dawson entertained a business expectancy but rather were directed only to the NASD. However, defendants admit that they know that NASD member firms are required to access a prospective employee's NASD file before hiring and that other NASD members would access Dawson's U–5 information before hiring Dawson. Defs.' Resp. Add'l Facts ¶ 126. Under these circumstances we believe that it is a matter for the jury to decide whether by submitting potentially defamatory material to the NASD—which, through the U–5 information, "administers an employment clearinghouse ... [giving] other members of the Association potentially valuable information concerning the ... suitability of potential employees," Baravati, 28 F.3d at 708—defendants' conduct was directed toward Dawson's prospective employers.

Accordingly, for all of the foregoing reasons, defendants' motion for summary judgment as to Count VI is granted in part and denied in part. The motion is granted to the extent that the statements made at the 1993 Managers' Meeting and in the training videotape, or in the third amended Form U–5, are the basis for Dawson's tortious interference claim; and, the motion is granted as to any alleged business expectancy other than that which Dawson had with Pruco Securities. The motion is denied in all other respects. Thus, to be clear, Dawson's tortious interference claim may proceed only to the extent that Dawson maintains that defendants' statements on the first and second amended Forms U–5 purposely interfered with his business expectancy with Pruco Securities.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Count VII of Dawson's complaint alleges that "New York Life's conduct in widely disseminating the false and defamatory charges about Plaintiff throughout New York Life and memorializing them in the permanent NASD files ... was virtually certain to ruin Plaintiff's reputation in the life insurance and securities community. New York Life's conduct was—and continues to be— particularly outrageous because the memorialization of the charges ... lent credibility, as New York Life anticipated, to the false and defamatory charges about plaintiff." Supplemental Am.Compl. ¶ 93.

■■■ To prevail on a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must prove: (1) extreme and outrageous conduct; (2) resulting in severe emotional distress; (3) that was intentional or in reckless disregard of the consequences; and (4) that proximately caused the distress. Public Finance Corp. v. Davis, 66 Ill.2d 85, 90, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976). Defendants' motion for summary judgment as to Dawson's intentional infliction claim argues only that their alleged conduct does not sink to that level which is actionable.

In Public Finance, the court characterized "extreme and outrageous conduct" as "that which goes beyond all possible bounds of decency." Id. The Illinois Supreme Court has noted on several occasions that "[t]he outrageousness of a defendant's conduct must be determined in view of all the facts

port Dawson's tortious interference claim. For this reason alone, to the extent that Dawson's tortious interference claim is based on defamatory statements made at the Managers' Meeting and repeated in the compliance training videotape, defendants are entitled to summary judgment on that portion of the claim.

and circumstances pleaded and proved in a particular case." *McGrath v. Fahey*, 126 Ill.2d 78, 90, 127 Ill.Dec. 724, 729, 533 N.E.2d 806, 811 (1988); *see also Doe v. Calumet City*, 161 Ill.2d 374, 392, 204 Ill.Dec. 274, 283, 641 N.E.2d 498, 507 (1994) ("Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particular case.").[41]

▮▮▮ Viewing the evidence in this case in the light most favorable to Dawson, this Court believes that a jury could reasonably find that defendants defamed Dawson by effectively placing responsibility for the Corpus Christi multi-million adverse judgment on Dawson, and in the course of doing so, attributing knowledge of, encouragement of, and participation in, forgery and policyholder fraud to Dawson. Defendants' allegedly defamatory statements were published to more than 700 New York Life managers, employees and their spouses from all over the United States at the 1993 Managers' Meeting, as well as to thousands of New York Life agents nationwide who were required to view the compliance training videotape. Additionally, a jury could find that defendants' characterizations of the allegations of the Cruz complaint on Dawson's amended Form U–5s were defamatory and made in furtherance of defendants' efforts to direct blame for the Corpus Christi incidents toward Dawson and away from the New York Life home office. Without question, Dawson will face many obstacles at trial in establishing the foregoing propositions; however, if he succeeds in persuading the jury as to his underlying defamation claims and theory of the case, we believe that a jury could reasonably find defendants' conduct to be so extreme and outrageous as to support liability for intentional infliction of emotional distress (or at least that reasonable minds could differ as to this proposition). Accordingly, we find that a genuine issue of material fact exists as to this question and we must allow the claim to proceed to trial. Defendants' motion for summary judgment as to the intentional infliction claim (Count VII) is denied.

## IV. BREACH OF CONTRACT

▮▮▮ Dawson alleges in Count VIII that he had an oral agreement with New York Life relating to his compensation. Although it is not entirely clear from the allegations of the complaint, it appears that this oral agreement involved elements of his compensation separate and distinct from his base compensation. In particular, Dawson's allegations relate to an agreement regarding adjustments to Dawson's base salary based on expenses charged to Dawson's office. *See* Supplemental & Am.Compl. ¶¶ 98, 99. Specifically, Dawson alleges that:

> New York Life breached its agreement with plaintiff by charging to the Oak Brook, Illinois office expenses wholly unrelated to the Oak Brook office operation. By way of illustration, New York Life charged rent expenses of another New York Life office to the Oak Brook Illinois office.

*Id.* ¶ 100. Dawson's deposition testimony in this lawsuit provides other examples of expenses that he contends were improperly

---

**41.** Illinois opinions addressing whether particular alleged conduct is sufficiently extreme and outrageous to be actionable under an intentional infliction theory yield an extremely diverse set of outcomes that are not easily reconcilable. As a consequence, courts asked to decide the issue are inevitably presented with arguments by the defendant that the conduct at issue in the case at bar is not as egregious as that held to be unactionable in cases *X, Y* and *Z*, to which the plaintiff responds by citing its own string of authority demonstrating that conduct far less outrageous than that presented in the case at bar has been found to be actionable. However, because the issue of whether conduct is sufficiently extreme and outrageous to support liability must be determined by all of the particular facts of the case at bar, in most instances such comparisons to the facts of other cases will be of minimal assistance. In a similar vein, Illinois courts have recognized the limited value of attempting factual comparisons in the context of defamation suits. So, for example, in *Mittelman v. Witous*, 171 Ill.App.3d 691, 706, 121 Ill.Dec. 615, 623, 525 N.E.2d 922, 930 (1st Dist.1988), the appellate court noted, "We decline to determine whether or not [defendant's] statement was defamatory by comparing it to statements at issue in other cases, for each case of slander must be considered on its own facts." (internal quotation marks and citation omitted). The Illinois Supreme Court echoed this sentiment noting, "the time spent in such [factual comparison analyses] would be substantial and the benefit to be derived ... minimal." *Mittelman*, 135 Ill.2d at 248, 142 Ill.Dec. at 245, 552 N.E.2d at 986.

charged to the Oak Brook Office, and, against his compensation. Pl.'s Appendix at 27E–27H. Dawson's deposition testimony also explains that he allegedly had an oral agreement with New York Life through John Zorio, Dawson's superior, that these charges to the Oak Brook Office were to be made for accounting purposes only and would not actually be charged against his compensation. *Id.* at 27D, 27G–27H.

In support of its motion for summary judgment, New York Life relies on Dawson's deposition testimony that before March of each year, New York Life notified him in writing of his base compensation for the coming year and that New York Life always honored the written agreement as to his base compensation, except for one occasion not relevant here. *See* Defs.' Facts ¶¶ 107, 108. However, the Court finds that because Dawson's breach of contract claim is apparently unrelated to his base salary agreement, the facts presented by New York Life do not satisfy defendants' initial burden as moving party to identify evidence demonstrating the absence of a genuine issue of material fact.

The Court also notes that because Dawson's breach of contract claim is not based on an oral agreement concerning base compensation, New York Life's argument that "[a]ny purported oral agreement about base compensation had in fact been modified before the 'contract' began to run," is misplaced. Finally, we reject New York Life's attempt to seize upon one sentence from Dawson's deposition and argue that Dawson has admitted that his breach of contract claim is, in fact, based on his base compensation. When Dawson's entire deposition testimony is considered it is quite apparent that Dawson's claim has nothing to do with his base salary but instead relates to charges against his compensation based on improper expense charges.

Accordingly, to the extent that defendants' motion seeks summary judgment as to Dawson's breach of contract claim (Count VIII), the motion is denied.

### CONCLUSION

Defendants New York Life Insurance Company and NYLIFE Securities Inc.'s mo-

tion for summary judgment is granted in part and denied in part. The motion is granted as to Count III and granted in part as to Count VI as follows: To the extent that the claims in Count VI are based on statements made at the 1993 Managers' Meeting, in the training videotape, or in the third amended Form U–5, defendants' motion is granted. Also, to the extent that the claims in Count VI are based on Dawson's business expectancy with any entity other than Pruco Securities, defendants' motion is granted. The motion is denied in all other respects.

The Court also expressly notes that its ruling herein has applied liberal standards that required the Court to draw all reasonable inferences, and resolve all ambiguities, in favor of Dawson. Applying these required standards has led this Court to conclude that Dawson's rights, as detailed herein, may have been violated in the course of the defendants' reaction to the *Hernandez* verdict. Dawson is therefore entitled to a trial, which will begin on September 9, 1996, to determine if his rights were in fact violated.

A Final Pretrial Order consistent with this Opinion is due on August 19, 1996. The Final Pretrial Order should include any motions *in limine*. An agreed and disputed set of jury instructions will be due on September 11, 1996. A status hearing will be held on July 23, 1996 at 9:30 a.m. in open court to discuss procedures that will ensure a fair and efficient trial of this lawsuit.